**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Nigel D. INCE, Defendant–Appellant.**

No. 93–5247.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 29, 1993.

Decided April 7, 1994.

**ARGUED:** Daniel Peter Barrera, Chamowitz & Chamowitz, Alexandria, VA, for appellant.

Anita Thomas, Sp. Asst. U.S. Atty., Alexandria, VA, for appellee. **ON BRIEF:** Kenneth E. Melson, U.S. Atty., Alexandria, VA, for appellee.

Before MURNAGHAN and HAMILTON, Circuit Judges, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

## OPINION

MURNAGHAN, Circuit Judge:

Appellant Nigel D. Ince was convicted by a jury for assault with a dangerous weapon, with intent to do bodily harm. Because the United States' only apparent purpose for impeaching one of its own witnesses was to circumvent the hearsay rule and to expose the jury to otherwise inadmissible evidence of Ince's alleged confession, we reverse.

I

Late on the evening of September 4, 1992, a rap concert and dance at the Sosa Recreation Center at Fort Belvoir, Virginia ended abruptly when members of two of the bands performing there got in a scuffle. Shortly thereafter, a black male wearing an orange shirt or jacket fired a nine millimeter pistol twice at trucks leaving the Recreation Center's parking lot. Defendant-appellant Nigel Ince, Angela Neumann, and two of their friends hopped in their van and headed for Pence Gate, Fort Belvoir's nearest exit. The military police pulled the van, as well as other vehicles leaving the parking lot, over to the side of the road and asked the drivers and passengers to stand on the curb. Two men whose vehicles had also been pulled over identified Ince as the black male who had fired the shots in the parking lot, although they noted that he was no longer wearing an orange shirt. As part of the investigation that followed, Military Policeman Roger D. Stevens interviewed and took a signed, unsworn statement from Neumann. She recounted that Ince had admitted to firing the shots, but said he no longer had the gun.

The United States indicted Ince for violating 18 U.S.C. § 113(c), assault with a dangerous weapon, with intent to do bodily harm. At Ince's trial the Government called Neumann to the stand. When her memory supposedly failed her, the prosecution attempted to refresh her recollection with a copy of the signed statement that she had given Stevens on the night of the shooting. Even with her recollection refreshed, she testified that she could no longer recall the details of her conversation with Ince. Following Neumann's testimony, the Government excused her and called Stevens, who testified (over the objection of defense counsel) as to what Neumann had told him shortly after the shooting. The trial ended with a deadlocked jury.

At the second trial, the Government again called Neumann. She again acknowledged that she had given the military police a signed statement describing what Ince had told her immediately after the shooting. But she repeatedly testified that she could no longer recall the details of Ince's remarks, despite the prosecution's effort to refresh her recollection with a copy of the statement. The Government neither offered the statement into evidence as an exhibit nor read it into evidence under Rule 803(5) of the Federal Rules of Evidence. *See* Fed.R.Evid.

803(5) (hearsay exception for past recorded recollections).

Over defense counsel's repeated objections, the Government again called MP Stevens to the stand, supposedly to impeach Neumann as to her memory loss. He testified that, within hours of the shooting, Neumann had told him that Ince had confessed to firing the gun. The Government also called two eyewitnesses who identified Ince as the gunman.

The defense's theory of the case was mistaken identity: Frank Kelly, not Nigel Ince, had fired the shots. Kelly, also a young black male (although of somewhat different physique), attended the dance, wore a long-sleeved orange jacket, was supposedly spotted by Neumann in the parking lot holding a handgun, and was found by the FBI five days later with a nine millimeter pistol hidden in his bedroom. In an attempt to undermine the defense's theory of the case, the prosecution, in its closing argument, reminded the jurors that they had "heard testimony that Ms. Neumann made a statement to an MP [immediately following the shooting]. And she told [him] at that time that the defendant said, 'Frank didn't shoot the gun; I shot the gun.'"

The second time around, the jury convicted Ince. The district judge sentenced him to forty-one months in prison, plus two years of supervised release. Ince now appeals, requesting a reversal of his conviction and a new trial.

## II

Appellant Ince argues that the testimony of MP Stevens was inadmissible hearsay because the Government offered it to prove the truth of the matter asserted in Neumann's out-of-court statement (*i.e.,* that Ince confessed to the crime). The United States counters that Stevens's testimony was admissible because the Government offered it only to impeach Neumann's credibility. Ince responds that the prosecution, having already seen Neumann's performance on the stand at the *first* trial, was fully aware that she would not testify as to Ince's alleged confession at the *second* trial either. Nevertheless, the prosecution put her on the stand a second time to elicit testimony inconsistent with her prior statement to Stevens, so as to provide a foundation to offer Stevens's so-called "impeaching" evidence and thereby to get Ince's confession before the jury. Thus, the sole question presented on appeal is whether the admission of Stevens's testimony constituted reversible error.[1]

### A

■■ Rule 607 of the Federal Rules of Evidence provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Fed. R.Evid. 607. One method of attacking the credibility of (*i.e.,* impeaching) a witness is to show that he has previously made a statement that is inconsistent with his present testimony. Even if that prior inconsistent statement would otherwise be inadmissible as hearsay, it may be admissible for the limited purpose of impeaching the witness. At a criminal trial, however, there are limits on the Government's power to impeach its own witness by presenting his prior inconsistent statements. *See United States v. Morlang,* 531 F.2d 183 (4th Cir.1975). In *Morlang,* we reversed the defendant's conviction for conspiracy to bribe and bribery because the Government had employed impeachment by prior inconsistent statement "as a mere subterfuge to get before the jury evidence not otherwise admissible." *Id.* at 190.[2]

---

1. Ince has not claimed that the admission of *Neumann's* testimony was erroneous. Also, he did not object to the Government's closing argument at trial, nor does he claim on appeal that the closing argument constituted plain error under Rule 52(b) of the Federal Rules of Criminal Procedure.

2. At the time of Morlang's trial, Congress had not yet adopted the relevant Federal Rules of Evidence, *see, e.g.,* Fed.R.Evid. 403 (exclusion of relevant evidence on grounds of prejudice or confusion), 607 (who may impeach), 613 (prior statements of witnesses), 801(d)(1) (prior inconsistent statements that are not hearsay); thus, in reviewing Morlang's conviction, we were not bound by the Rules. *See Morlang,* 531 F.2d at 189 n. 14. Subsequent to the Rules' adoption by Congress, however, every circuit of the U.S. Court of Appeals has followed *Morlang.* *See United States v. Peterman,* 841 F.2d 1474, 1479 n. 3 (10th Cir.1988) (citing cases), *cert. denied,* 488

At Morlang's trial the Government had called Fred Wilmoth, an original codefendant who had subsequently pleaded guilty, as its first witness despite the fact that his previous statements to the Government suggested he would be hostile. The real purpose for calling Wilmoth was apparently to elicit a denial that he had ever had a conversation with a fellow prisoner in which he had implicated Morlang. Having obtained the expected denial, the Government then called Raymond Crist, another prisoner, to impeach Wilmoth with the alleged prior inconsistent statement. As expected, Crist testified that his fellow inmate Wilmoth had made a conclusory statement from which one could only infer Morlang's guilt. As expected, the jury delivered a guilty verdict. *See id.* at 188–90 & 188 n. 11.

In reversing Morlang's conviction, Judge Widener explained that courts must not "permit the government, in the name of impeachment, to present testimony to the jury by indirection which would not otherwise be admissible." *Id.* at 189. "To permit the government in this case to supply testimony which was a naked conclusion as to Morlang's guilt in the name of impeachment," he explained, would be tantamount to convicting a defendant on the basis of hearsay:

> Foremost among [the notions of fairness upon which our system is based] is the principle that men should not be allowed to be convicted on the basis of unsworn testimony....
>
> We must be mindful of the fact that prior unsworn statements of a witness are mere hearsay and are, as such, generally inadmissible as affirmative proof. The introduction of such testimony, even where limited to impeachment, necessarily in-

creases the possibility that a defendant may be convicted on the basis of unsworn evidence, for despite proper instructions to the jury, it is often difficult for [jurors] to distinguish between impeachment and substantive evidence.... Thus, the danger of confusion which arises from the introduction of testimony under circumstances such as are presented here is so great as to upset the balance and [to] warrant continuation of the rule of exclusion.

*Id.* at 190 (citations omitted).[3]

Federal evidence law does *not* ask the judge, either at trial or upon appellate review, to crawl inside the prosecutor's head to divine his or her true motivation. *See* 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 607[01], at 607–20 (1993). Rather, in determining whether a Government witness' testimony offered as impeachment is admissible, or on the contrary is a "mere subterfuge" to get before the jury substantive evidence which is otherwise inadmissible as hearsay, a trial court must apply Federal Rule of Evidence 403[4] and weigh the testimony's impeachment value against its tendency to prejudice the defendant unfairly or to confuse the jury. *See United States v. MacDonald,* 688 F.2d 224, 234 (4th Cir.1982) (citing and affirming *United States v. MacDonald,* 485 F.Supp. 1087, 1093–94 (E.D.N.C.1979)), *cert. denied,* 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983); *see also United States v. Webster,* 734 F.2d 1191, 1193 (7th Cir.1984) (stating that the defendant may "argue that the probative value of the evidence offered to impeach the witness is clearly outweighed by the prejudicial impact it might have on the jury, because the jury would have difficulty confining use of

---

U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 774 (1989).

**3.** Similarly, Judge Richard A. Posner of the Seventh Circuit has explained:

> [I]t would be an abuse of [Federal Rule of Evidence 607], in a criminal case, for the prosecution to call a witness that it knew would not give it useful evidence, just so it could introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence—or, if it didn't miss it, would ignore it. The purpose would not be to im-

peach the witness but to put in hearsay as substantive evidence against the defendant, which Rule 607 does not contemplate or authorize.

*United States v. Webster,* 734 F.2d 1191, 1192 (7th Cir.1984).

**4.** Rule 403 allows the trial judge to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Fed.R.Evid. 403.

the evidence to impeachment") (citing Fed. R.Evid. 403).

■ When the prosecution attempts to introduce a prior inconsistent statement to impeach its own witness, the statement's likely prejudicial impact often substantially outweighs its probative value for impeachment purposes because the jury may ignore the judge's limiting instructions and consider the "impeachment" testimony for substantive purposes. *See MacDonald,* 688 F.2d at 234 (citing *Morlang,* 531 F.2d at 190); *State v. Hunt,* 324 N.C. 343, 350, 378 S.E.2d 754, 758 (1989). That risk is multiplied when the statement offered as impeachment testimony contains the defendant's alleged admission of guilt. Thus, a trial judge should rarely, if ever, permit the Government to "impeach" its own witness by presenting what would otherwise be inadmissible hearsay if that hearsay contains an alleged confession to the crime for which the defendant is being tried. *Cf. United States v. Brewer,* 1 F.3d 1430, 1438–39 & n. 2 (4th Cir.1993) (Widener, J., dissenting) (citing *Morlang,* 531 F.2d at 190).[5]

### B

■ In the case at bar, MP Stevens testified that Ince had *admitted* to firing the gun—the critical element of the crime for which he was being tried. It is hard to imagine any piece of evidence that could have had a greater prejudicial impact than such a supposed naked confession of guilt. Even if the other evidence which was properly admitted at trial had provided overwhelming proof of Ince's guilt—which it did not, *see infra* Part III–D—and even if the judge had given the jury a clear limiting instruction—which he did not, *see infra* Part III–C—Stevens's presentation of additional unsworn hearsay testimony going directly to the issue of Ince's

guilt was extremely prejudicial. *Cf. Morlang,* 531 F.2d at 190.

Given the likely prejudicial impact of Stevens's testimony, the trial judge should have excluded it absent some extraordinary probative value. Because evidence of Neumann's prior inconsistent statement was admitted solely for purposes of impeachment, its probative value must be assessed solely in terms of its impeaching effect upon Neumann's testimony or overall credibility. Our review of the record below, however, shows that the probative value of Stevens's testimony *for impeachment purposes* was nil. Unlike the classic "turncoat" witness, Neumann certainly had not shocked the Government with her "loss of memory" at the second trial, as she had made it plain during the first trial that she would not readily testify to the alleged confession of her friend, Nigel Ince.[6]

Furthermore, Neumann's actual in-court testimony did not affirmatively damage the Government's case; she merely refused to give testimony that the Government had hoped she would give. Thus, the prosecution had no need to attack her credibility. *Cf.* 27 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6093, at 515 (1990) ("If testimony does no damage, impeachment evidence has no probative value."); 27 *id.* § 6092, at 492 n. 31. She testified that, immediately after the shooting, as they left the scene of the crime but before the military police pulled them over, (1) Ince stated that Frank Kelly—the person whom Ince's lawyer identified at trial as the likely perpetrator of the crime—was *not* the person who had fired the gun, (2) Ince stated that "he didn't have [the gun] with him," and (3) Ince instructed Neumann to tell the military police that she knew nothing about the events of the evening. She presented no evidence affirming or denying Ince's alleged confession. Taken as a

---

**5.** The majority in *Brewer* did not address the *Morlang* issue because it found that the defendant had failed to preserve his objection and the error was not plain. *See Brewer,* 1 F.3d at 1434–35 & 1435 n. 5.

**6.** The prosecution claims, for the first time at oral argument on appeal, that Neumann had cooperated with the prosecution *between* the two trials and that it therefore had reason to believe

that her testimony at the second trial would be entirely different from her testimony at the first trial. Even if we were to credit the Government's account, we would reach the same result. The prosecution's supposed uncertainty about how Neumann would testify on direct examination at the second trial does not affect whether the jury was misled, confused, or unfairly prejudiced by Stevens's subsequent testimony.

whole, then, Neumann's testimony probably *strengthened* the Government's case. Therefore, evidence attacking her credibility had no probative value *for impeachment purposes.*

Because Stevens's so-called "impeachment" testimony was both highly prejudicial and devoid of probative value as impeachment evidence, the trial judge should have recognized the Government's tactic for what it was—an attempt to circumvent the hearsay rule and to infect the jury with otherwise inadmissible evidence of Ince's alleged confession. Instead, the judge allowed Stevens's testimony to come before the jury in clear violation of *Morlang* and its progeny, notwithstanding defense counsel's proper and timely objections. As Judge Widener recently wrote, "The government simply should not be allowed to employ tactics of overkill that fly in the face of direct circuit precedent that has been established for more than fifteen years." *Brewer*, 1 F.3d at 1439 (Widener, J., dissenting).

### III

The United States has contended that, even if Stevens's testimony was improper, its admission was harmless error and Ince's conviction should stand. Ince has replied that the jury would not have convicted him absent the improperly admitted evidence of his alleged confession.[7]

7. Ince also argues that, as a matter of law, allowing inadmissible confession testimony can *never* be harmless error because the impact of confession testimony in any criminal trial is devastating. That argument has been foreclosed, however, by the Supreme Court. In *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the Court held that even *coerced* confessions that had been obtained and introduced at trial in clear violation of the defendant's *constitutional* rights could in some circumstances be harmless beyond a reasonable doubt. *See id.* at 306–12, 111 S.Ct. at 1262–66. It would be illogical, therefore, to conclude, as Ince asks us to do here, that a judgment of conviction can *never* be affirmed if it was based on a legally-obtained, voluntary confession introduced at trial in violation of federal *evidence* law.

8. Ince has claimed that the admission of Stevens's testimony violated his Sixth Amendment right of confrontation. We reject that claim because Neumann testified in person, under oath,

### A

Because the evidentiary error in the instant case lacks constitutional dimension[8] and was properly preserved by defense counsel's timely objection at trial, we look to Rule 52(a) of the Federal Rules of Criminal Procedure, which provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Fed.R.Crim.P. 52(a); *see also* Fed.R.Evid. 103 (stating that an error may be predicated upon a ruling that admits evidence *if* "a substantial right of the party is affected" and a timely, specific objection to the ruling appears of record).

Justice O'Connor, speaking for the Court, has explained that, under Rule 52, an error "affect[ing] substantial rights" ordinarily "must have been prejudicial: It must have affected the outcome of the District Court proceedings." *United States v. Olano*, —— U.S. ——, ——, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993).[9] "[The] Court of Appeals normally engages in a specific analysis of the District Court record—a so-called 'harmless error' inquiry—to determine whether the error was prejudicial." *Id.* (dictum). Justice O'Connor further explained that Rule 52(a) saddles the Government with the burden of showing that the claimed error had no prejudicial impact on the jury's deliberations. *See id.* (dictum). If the Govern-

in plain view of the jurors, who could observe her demeanor and assess her credibility, and she was subject to full and effective cross-examination (and re-cross-examination). *See Maryland v. Craig*, 497 U.S. 836, 845–46, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990); *United States v. Owens*, 484 U.S. 554, 557–60, 108 S.Ct. 838, 841–43, 98 L.Ed.2d 951 (1988); *Kentucky v. Stincer*, 482 U.S. 730, 737–39, 107 S.Ct. 2658, 2662–63, 96 L.Ed.2d 631 (1987); *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970); *see also United States v. Payne*, 492 F.2d 449, 452–54 (4th Cir.), *cert. denied*, 419 U.S. 876, 95 S.Ct. 138, 139, 42 L.Ed.2d 115, 116 (1974).

9. The word "prejudicial" here refers to an error that altered the jury's verdict. Part II of this opinion, *supra*, uses the same word in an entirely different way when balancing probative value against "prejudicial impact" under Rule 403 of the Federal Rules of Evidence.

ment fails to show the absence of prejudice, the reviewing court must automatically reverse the conviction. *See id.* at ——, 113 S.Ct. at 1783 (Stevens, J., dissenting).

The Fourth Circuit's longstanding interpretation of Rule 52(a) comports with that of the Supreme Court:

> The proper test of harmlessness of nonconstitutional error is whether we, in appellate review, can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). In applying this test, we must be mindful that it does not ask simply whether we believe that irrespective of the error there was sufficient untainted evidence to convict but, more stringently, whether we believe it "highly probable that the error did not affect the judgment." *United States v. Nyman,* 649 F.2d 208, 212 (4th Cir.1980) (quoting Roger J. Traynor, *The Riddle of Harmless Error* 34–35 (1970)).

*United States v. Urbanik,* 801 F.2d 692, 698–99 (4th Cir.1986); *accord United States v. Peay,* 972 F.2d 71, 76 (4th Cir.1992) (Luttig, J., concurring in part and dissenting in part), *cert. denied,* —— U.S. ——, 113 S.Ct. 1027, 122 L.Ed.2d 172 (1993); *United States v. Sanders,* 964 F.2d 295, 299 (4th Cir.1992); *United States v. Vogt,* 910 F.2d 1184, 1193 (4th Cir.1990), *cert. denied,* 498 U.S. 1083, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991); *Nyman,* 649 F.2d at 211–12; *see also United States v. Davis,* 657 F.2d 637, 640 (4th Cir. 1981), *cited with approval in United States v. Robinson,* 485 U.S. 25, 36, 108 S.Ct. 864, 871, 99 L.Ed.2d 23 n. * (1988) (Blackmun, J., concurring in part and dissenting in part).

■ In assessing whether it is "highly probable" that the error did not "affect" or "substantially sway" a judgment of conviction, we must consider three factors: (1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case. *See Urbanik,* 801 F.2d at 699; *Nyman,* 649 F.2d at 212; *Gaither v. United States,* 413 F.2d 1061, 1079 (D.C.Cir.1969).

## B

■ The main issue at Ince's trial was the identification of the person who had fired the gun. The United States, of course, argued that Ince *was* that person; the defendant argued that it may well have been Frank Kelly instead. Thus, the issue affected by the error was not only "central"; it was virtually the *only* controverted issue at trial—the identification of defendant Ince as the gunman. Thus, the first factor in our three-factor test militates against finding the error harmless.

## C

■ Next, we turn to the steps taken at trial to mitigate the effects of the error. As an initial matter, we note that a trial court would have to go to extraordinary lengths to cure the harm caused by an erroneously admitted confession. Evidence of a confession can have such a devastating and pervasive effect that mitigating steps, no matter how quickly and ably taken, cannot salvage a fair trial for the defendant. As Justice White has explained,

> [a] confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.... [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."

*Arizona v. Fulminante,* 499 U.S. 279, 296, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991) (quoting *Bruton v. United States,* 391 U.S. 123, 139–40, 88 S.Ct. 1620, 1630, 20 L.Ed.2d 476 (1968) (White, J., dissenting)); *see also id.* at 313, 88 S.Ct. at 1266 (Kennedy, J., concurring in the judgment) ("[T]he court conducting a harmless-error inquiry must appreciate the indelible impact a full confession may have on the trier of fact....").

■ The United States points to two supposedly mitigating steps taken at Ince's trial,

but they fall far short of purging the error committed here. First, the Government claims that it "clearly stated" at trial that MP Stevens's testimony was offered only for impeachment purposes. Our review of the transcript, however, shows that the prosecutor issued that "clear statement" during a sidebar. Therefore, it could not possibly have mitigated the effects that Stevens's erroneously admitted testimony might have had *on the jurors,* for they never heard the prosecutor's disclaimer.

Second, the United States argues that the district judge instructed the jury to use prior inconsistent statements solely for the purpose of assessing a witness' credibility. Although we recognize the presumption of cure by a court's instruction, it seems probable here that the jury was unable to follow the instruction on impeachment by prior inconsistent statement, much less to realize that it pertained to Stevens's testimony.[10] *See Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., concurring) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury, ... all practicing lawyers know to be unmitigated fiction." (citations omitted)); *cf. Morlang,* 531 F.2d at 188–90 (reversing a conviction notwithstanding the fact that the trial judge gave the jury a limiting instruction). Moreover, the prosecutor, in her closing argument, argued the truth of Neumann's out-of-court statement recounting Ince's alleged confession, thus vitiating any possible curative function that the judge's limiting instruction might have otherwise served. *See United States v. Hogan,*

763 F.2d 697, 703, *corrected in part,* 771 F.2d 82 (5th Cir.1985), *and affirmed in relevant part,* 779 F.2d 296 (5th Cir.1986). Thus, the meagerness of the steps taken to mitigate the effects of the erroneous admission of Ince's alleged confession also weighs heavily against finding the error harmless.

## D

Finally, we come to "the single most important factor" in a nonconstitutional harmless-error inquiry: whether the case was "close." *Urbanik,* 801 F.2d at 699. We have previously explained that

> [a]ppellate assessment of the "closeness" of an issue as it probably appeared to a jury is of course a highly judgmental process, involving much more of feel than of science. While assessing closeness necessarily requires looking to the probative force of other evidence tending to prove the issue, that ... is not for the purpose of determining whether, if independently considered, that evidence would have sufficed to convict. The inquiry into "closeness" instead involves assessing whether the other evidence is not only sufficient to convict, but whether it is sufficiently powerful in relation to the tainted evidence to give "fair assurance" that the tainted evidence did not "substantially sway" the jury to its verdict.

*Id.*

Applying that test, we conclude that Ince's case was sufficiently close to prevent finding the erroneous admission of his alleged confession through disguised hearsay

---

10. *The jury instructions provided, in "relevant" part:*

> After making your own judgement, you will give the testimony of each witness such credibility, if any, as you may think it deserves.
>
> You may also consider any demonstrated bias, prejudice or hostility of a witness in determining the weight to be accorded to his testimony.
>
> Evidence that at some other time a witness, other than the accused, has said or done something, or has failed to say or do something, which is inconsistent with the witness' testimony at the trial, may be considered by the jury for the sole purpose of judging the credibility of the witness; but may never be considered as evidence or proof of the truth of any such statement.

> The testimony of a witness may be disregarded or impeached by showing that he previously made statements which are inconsistent with his present testimony. The earlier contradictory statements are admissible only to impeach the credibility of the witness, and not to establish the truth of these statements. It is the province of the jury to determine the credibility, if any, to be given to the testimony of a witness who has been impeached.
>
> If the witness is shown knowingly to have testified falsely concerning any material matter, you have the right to distrust such witness; ... and you may reject all the testimony of that witness or give it such credibility as you may think it deserves.

585

harmless. First, we note that Ince was tried twice, the first time resulting in a mistrial. Had the case against him been as strong as the Government would have us believe, it seems unlikely that the first jury would have ended in deadlock. *See Sanders,* 964 F.2d at 299 (assessing "the closeness of the case" and highlighting "the critical facts that the jury could not reach a verdict ... at [the defendant's] first trial and that the second jury deliberated for some hours before reaching a guilty verdict in a relatively simple, straightforward case"). Standing alone, however, such reasoning might not prevent a finding of harmlessness.

Second, and more important, the tainted evidence here is a confession allegedly uttered by the defendant himself and the jury first heard of that confession through the testimony of a uniformed Military Police officer. Under such circumstances, the untainted evidence would have to be overpowering in order to give us "fair assurance" that the confession evidence did not "substantially sway" the jury to its verdict. In the present case, the untainted evidence upon which the jury could have based a finding that the gunman was Nigel Ince—rather than Frank Kelly—was simply not powerful enough to provide us that assurance.[11]

Ince and Kelly are both young black males. They were spotted standing near each other in the dark parking lot of the Sosa Recreation Center immediately prior to the shootings. Ince wore a long orange T-shirt that night, Kelly a long-sleeved orange jacket. When Ince was arrested, the police found no firearms on his person or in his van; but the FBI's subsequent search of Kelly's bedroom turned up a nine-millimeter pistol, the same kind of gun that had been used in the parking lot incident. One of the two eyewitnesses who identified Ince on the night of the shooting admitted at trial that he had drunk "a few" beers that evening and that he had not actually seen the shooter's face, as it was rather dark in the parking lot and the man had run off immediately after firing two shots in rapid succession. When the MPs pulled vehicles over to the side of the road and asked their occupants to stand on the curb, the two eyewitnesses who eventually identified Ince as the gunman each spoke with the bare-chested Ince and took a long look at his face; neither was confident that Ince was the gunman, however, until the police had him pull on his orange T-shirt. The record below suggests that the two eyewitnesses never had the opportunity to view Ince, in his orange shirt, standing next to Kelly, in his orange jacket, as the latter had apparently fled in a different direction.

Based on our examination of the transcript of the second trial, taken as a whole, we find the untainted evidence of Ince's guilt fairly strong, but not overwhelming. It may or may not have sufficed to convict Ince, but (as explained above) that is not the relevant test here. The Government has failed to persuade us that the untainted evidence implicating Ince was so conclusive that it is "highly probable" that the erroneous admission of Ince's alleged confession did not affect the judgment. *See Urbanik,* 801 F.2d at 699; *Nyman,* 649 F.2d at 212. At the first trial, the jury was unable to find guilt beyond a reasonable doubt. At the second trial, the identification issue was again close—indeed, close enough that we cannot say with fair assurance that the improperly admitted evidence of Ince's alleged confession did not substantially sway the jury to its verdict. In combination, the closeness of the case, the centrality of the issue affected by the error, and the meager steps taken to mitigate the effects of that error leave us with but one possible conclusion: the erroneous admission of Stevens's testimony cannot be deemed harmless.

IV

Accordingly, we reverse the conviction of Nigel D. Ince and remand the case for a new trial.

*REVERSED AND REMANDED.*

11. "If the jury believes that the defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case." *Fulminante,* 499 U.S. at 313, 111 S.Ct. at 1266 (Kennedy, J., concurring in the judgment).