2015 COA 53

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

**v.**

**LaShawn Lynn HARRIS, Defendant– Appellant.**

**Court of Appeals No. 08CA1617**

Colorado Court of Appeals, Div. V.

Announced May 7, 2015

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24-51-1105, C.R.S. 2014.

Arapahoe County District Court No. 05CR3691, Honorable John L. Wheeler, Judge

Cynthia H. Coffman, Attorney General, Katherine A. Hansen, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Ellen K. Eggleston, Deputy State Public Defender, Dayna Vise, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE ASHBY

¶ 1 Defendant, LaShawn Lynn Harris, appeals the judgment of conviction entered on jury verdicts finding her guilty of child abuse—resulting in death and reckless endangerment. We conclude that the trial court erred by admitting other act evidence, and that this error was not harmless. We therefore reverse and remand for a new trial.

## I. Background

¶ 2 In 2005, Harris lived with her two children, L.L. (four years old) and O.W. (six years old), and her husband and his son, S.H. (four years old). On July 25, S.H. accidentally fell down the stairs at home and hit his head. Harris called 911, S.H. was taken to the hospital, and he was diagnosed with a subdural hematoma on the right side of his brain. S.H. was discharged from the hospital on July 28.

¶ 3 As a result of the fall and resulting subdural hematoma, S.H. began to experience seizures. On August 4, S.H. suffered a seizure at home, and was readmitted to the hospital. Doctors placed S.H. on anti-seizure medication and discharged him the following day, August 5. Within several days of his discharge, S.H. began to suffer multiple seizures per day. Harris and her husband understood that they were not to call 911 or take S.H. to the hospital unless he had a seizure that lasted more than ten minutes.

¶ 4 On the morning of August 22, Harris's husband was at school and Harris was at home with L.L., O.W., and S.H. While Harris was getting the children ready to leave the house, something happened to S.H. that rendered him unconscious and made it appear that he was sleeping. When Harris brought S.H. out of the house and put him in the car with the other children, he did not appear to be awake and was having difficulty breathing. Harris then drove the three children to her mother's house.

¶ 5 After arriving at her mother's house, Harris and her mother decided to take S.H. to the hospital. Instead of calling an ambulance, they drove S.H. to the hospital in the family car. Just before arriving at the hospital, it appeared that S.H. had stopped breathing. Harris's mother took S.H. into the emergency room and Harris left to take L.L. and O.W. to school. Harris then went to her own doctor appointment before returning to the hospital.

¶ 6 Upon arrival in the emergency room, S.H. was not breathing, but doctors successfully resuscitated him. Doctors conducted a CT scan of S.H.'s brain around ten o'clock that morning, and again at around three o'clock that afternoon. They diagnosed him with a subdural hematoma on the left side of his brain. This left-sided hematoma never resolved and S.H. died from it on September 2.

¶ 7 The prosecution charged Harris, and she was ultimately tried for first degree murder, child abuse—resulting in death, and reckless endangerment. L.L. and O.W. testified at trial, and the court admitted their respective forensic interviews, as well as testimony from people to whom L.L. and O.W. made statements about what happened to S.H. on the morning of August 22. Statements from both L.L. and O.W. indicated that Harris was upset with S.H. while they were getting ready to leave the house that morning, and L.L. stated in one of her forensic interviews and to several other people who testified at trial that Harris threw S.H. down the stairs and was "whooping" him that morning. Harris did not testify.

¶ 8 Numerous medical experts opined about what could have caused the injuries that S.H. presented with at the hospital on August 22. Prosecution experts testified that injuries like those suffered by S.H. are typically caused by high impact, blunt force trauma. Several prosecution experts also testified that, based on the lack of such an event in the history that Harris provided to doctors at the hospital, the injuries were likely caused by non-accidental trauma.

¶ 9 In contrast, the defense's medical expert testified that nothing in S.H.'s medical record indicated that his injury was the result of non-accidental trauma. He further opined that, based on the differences between the morning and afternoon CT scans on August 22, the left-sided hematoma that killed S.H. was caused by a small accidental fall that occurred within forty-eight hours before the morning of August 22 and was exacerbated by a seizure that morning.

¶ 10 Additionally, on the prosecution's motion, the court admitted evidence of prior acts pursuant to CRE 404(b). This evidence included an incident that occurred in 2003 (the car-chase incident).

¶ 11 L.L.'s father (not Harris's husband) and his fiancée testified that in 2003, when they went with their infant child to pick L.L. up from Harris's mother's house, Harris got into an argument with the fiancée. While the fiancée was in the driver's seat of her car with the infant in the back seat, Harris approached the driver's side door on foot and began yelling at the fiancée. When the fiancée tried to drive away with her infant and L.L. in the car, Harris got into her own car and intentionally rammed it into the back of the fiancée's car. L.L.'s father and L.L. hopped out of the car, the fiancée drove away, and Harris drove after her. After a brief chase, the fiancée stopped, and Harris intentionally drove her car into the fiancée's car a second time while the fiancée was standing beside it and the infant was still inside. The fiancée testified that had she not jumped out of the way this second time, she would have been crushed. The court admitted this evidence for "the limited purpose of the absence of mistake or accident and the state of mind of the defendant."

¶ 12 Ultimately, the jury found Harris not guilty of first degree murder, but guilty of child abuse—resulting in death and reckless endangerment. The jury was required to indicate whether it found Harris guilty of child abuse—resulting in death because she (1) caused an injury to S.H.'s life or health that resulted in his death; (2) permitted S.H. to be unreasonably placed in a situation that posed a threat of injury that resulted in death; or (3) both. The jury indicated that it found both. The court convicted and sentenced her accordingly.

¶ 13 On appeal, Harris argues that the court made numerous errors that entitle her to relief, including admitting the 2003 car-chase incident. Because we conclude that admitting evidence of that incident was reversible error, we comment on only one of Harris's other arguments.

## II.  Other Act Evidence

¶ 14 Harris argues that the court erred by admitting evidence of the car-chase incident, as well as several other incidents, pursuant to CRE 404(b). We review for an abuse of discretion. *See People v. Cousins*, 181 P.3d 365, 370 (Colo.App.2007). Even if the court abused its discretion, we will reverse only if the error was not harmless. *See Yusem v. People*, 210 P.3d 458, 469 (Colo.2009). We conclude that admitting the evidence of the car-chase incident was an abuse of discretion that was not harmless.

¶ 15 Evidence of other acts is not admissible to prove a defendant's character in order to show that the defendant acted in conformity with that character in committing the charged offense. CRE 404(b). However, other act evidence may be admissible to prove, among other things, the defendant's mental state or to show absence of mistake or accident. *Id.*

¶ 16 Our supreme court has articulated a four-part test to determine whether evidence is admissible pursuant to CRE 404(b): (1) the evidence must be related to a material fact; (2) the evidence must be logically relevant to that material fact; (3) the logical relevance must be independent of the impermissible inference that the defendant has a bad character and likely committed the charged offense because the defendant acted in conformity with that bad character; and (4) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. *See People v. Spoto*, 795 P.2d 1314, 1318 (Colo.1990). A material fact is one that is "of consequence" to the determination of the case. *See Yusem*, 210 P.3d at 463. Evidence is logically relevant to a material fact if it has any tendency to make the existence of that fact more or less likely. *Id.* at 464–65.

### A.  Car–Chase Evidence Not Logically Relevant to a Material Fact

¶ 17 Before trial, in a written motion and during a hearing on that motion, the prosecution sought permission to admit evidence of the car-chase incident, arguing that it was logically relevant to the material facts of Harris's identity and mental state, as well as to refute a potential defense of mistake or accident. In a written order, the court ruled that the evidence was admissible to show Harris's "motive and intent."

¶ 18 At trial, immediately before admitting the car-chase evidence through the testimony of L.L.'s father and his fiancée, the court instructed the jury to not consider the evidence "for any purpose other than the limited purpose of the absence of mistake or accident and the state of mind of the defendant." Thus, the evidence was admitted only to show Harris's state of mind and absence of mistake or accident.

¶ 19 The offenses for which Harris was tried all require either knowing or reckless conduct. *See* §§ 18–3–102(1)(f), C.R.S.2014 (first degree murder); 18–6–401(1)(a), (7)(a)(I), C.R.S.2014 (child abuse); 18–3–208, C.R.S.2014 (reckless endangerment). Acting recklessly requires a person to act with awareness and conscious disregard of a substantial risk. *See* § 18–1–501(8), C.R.S.2014.

¶ 20 Accordingly, in order to have been logically relevant to Harris's mental state at the time of the alleged child abuse crimes involving S.H., the car-chase incident had to have some tendency to show that, as alleged, on the morning of August 22, she was aware of and consciously disregarded a substantial risk that hitting S.H., throwing him down the stairs, pushing him into a wall, waiting too long to take him to the hospital, or any combination thereof would result in his death.

¶ 21 In general, other act evidence can be logically relevant to whether a defendant acted knowingly or recklessly at the time of the charged conduct in four different ways. First, the evidence may include the defendant's own statement or behavior that demonstrates the defendant's knowledge of

the outcome of, or the risk created by, the charged conduct. *See People v. Casias,* 2012 COA 117, ¶ 36, 312 P.3d 208. Second, other act evidence may include facts proving the defendant had direct knowledge of what the outcome or risk of the charged conduct would be. *Id.* Third, the other act may include circumstantial evidence showing that the defendant knew the risk or likely outcome of the charged conduct. *Id.* Fourth, the other act evidence may be logically relevant based on the doctrine of chances. *Id.*

¶ 22 None of these first three theories establishes the logical relevance of the car-chase incident to Harris's mental state on August 22. In the car-chase incident, Harris, acting out of anger towards the fiancée, allegedly rammed her car into the fiancée's car with a seven-week-old infant inside. She then rammed the fiancée's car a second time with the infant still inside in an attempt to strike the fiancée herself.[1] Although disturbing, nothing about that incident makes it any more or less likely that Harris knew the risks of "whooping" a child, pushing a child against a wall, throwing a child down the stairs, or waiting too long to take a child to the hospital, as she allegedly did to S.H. No child was injured in the car-chase incident and Harris's actions were aimed at an adult, not a child.

■ ¶ 23 Nor does the fourth theory, the doctrine of chances, establish the car-chase incident's logical relevance to Harris's mental state. Under this theory, the more often a defendant repeatedly performs a specific act, the more likely it is that the defendant knows the outcome or risks of that specific act. *Id.* at ¶ 39. Accordingly, the doctrine of chances requires that the other act and the charged conduct be sufficiently similar. *Id.* at ¶¶ 40–42.

¶ 24 Because, as explained above, Harris's conduct in the car-chase incident was not similar to the charged conduct, it was not logically relevant based on the doctrine of chances. For the same reason, the car-chase incident was not logically relevant to whether she hit, pushed, threw S.H. down the stairs, or waited too long to seek medical treatment

for S.H. by accident or mistake. *Id.* at ¶ 51 (logical relevance based on lack of accident or mistake requires similar conduct).

¶ 25 Indeed, the only thing to which the car-chase incident was logically relevant was Harris's propensity to get angry and fail to consider how her actions could pose a safety risk to children. Once admitted, the evidence invited the jury to infer that she acted in conformity with that propensity when S.H. was fatally injured—precisely the inference that CRE 404(b) expressly prohibits. Therefore, the court abused its discretion by admitting the car chase evidence.

### B. The Error was Not Harmless

■ ¶ 26 We must reverse if there is a reasonable probability that the car chase evidence contributed to Harris's conviction. *See Casias,* ¶ 62 (non-constitutional error is harmless unless there is a reasonable probability that it contributed to the defendant's conviction by substantially influencing the verdict or impairing the fairness of the trial). " '[A] reasonable probability' does not mean that it is 'more likely than not' that the error caused the defendant's conviction. Instead, it means only a probability sufficient to undermine confidence in the outcome of the case." *Id.* at ¶ 63 (citation omitted).

■ ¶ 27 To determine to what extent erroneously admitted evidence contributed to a defendant's conviction, we consider a number of factors, including the impact of the evidence and the overall strength of the prosecution's case. *Id.* at ¶ 64. However, the single most important factor in determining whether an error was harmless is whether the case was close. *Id.* at ¶ 69. If a case was close, there is a greater chance that the erroneously admitted evidence affected the jury's verdict. On the other hand, if properly admitted evidence is sufficiently powerful, an appellate court can be fairly assured that the erroneously admitted evidence did not substantially sway the jury. *Id.* at ¶ 69 (citing *United States v. Ince,* 21 F.3d 576, 584 (4th Cir.1994)). "A 'close case' can exist when experts on either side are in

---

1. There was conflicting evidence as to where L.L. was throughout the car-chase incident.

'sharp dispute' as to the central issue in the case." *Id.* at ¶ 73.

¶ 28 In *Casias,* the defendant (Casias) was charged with killing a seven-week-old baby while he was babysitting her alone. *Id.* at ¶¶ 1–2. The baby suffered skull and rib fractures, retinal hemorrhages, severe brain swelling, and bruising on her forehead. *Id.* at ¶ 5. The prosecution argued that these injuries were caused by Casias shaking the baby and striking her head on the day she was brought to the hospital. Casias claimed that the baby had accidentally rolled off a bed and struck her head on the hardwood floor a week before she was brought to the hospital. *Id.* at ¶ 6.

¶ 29 Because Casias was the only eyewitness, the central issue in the case was "whether or not the injuries that caused [the baby's] death were attributable to an accident." *Id.* at ¶ 71. On this issue, the prosecution presented medical experts who testified that, based on her injuries, the baby died from a non-accidental traumatic brain injury. *Id.* at ¶ 75. Casias's expert testified that there were plausible accidental explanations for how the baby died, but refused to state her ultimate opinion on what caused the baby's injuries. *Id.* at ¶ 77. The majority concluded that because Casias's expert "was unable to opine that [the baby's] fatal injuries were accidentally inflicted, the central issue ... was not *sharply* disputed, and, consequently, the case was not 'close' because of 'dueling experts.'" *Id.* at ¶ 78 (emphasis in original).

¶ 30 Here, like *Casias,* the central issue in the case was what caused S.H.'s injuries. However, unlike *Casias,* this issue was sharply disputed by dueling experts. Although several prosecution experts testified that S.H.'s injuries were the result of non-accidental impact trauma, Harris's expert directly disputed these assessments. He testified that S.H.'s injuries were definitively not the result of non-accidental impact trauma that occurred on the morning of August 22. Instead, he opined that the hematoma that killed S.H. was caused by a small accidental fall that occurred sometime during the forty-eight hours before August 22 and was then exacerbated by a seizure on the morning of

August 22. He justified this opinion by recounting his review of S.H.'s medical record and explaining, in detail, how he came to that conclusion. We recognize that several medical experts testified for the prosecution while only one testified for Harris. However, we may not weigh the evidence in this context. We may only determine whether Harris introduced credible expert testimony contradicting the prosecution's expert testimony and placed the central issue in sharp dispute.

¶ 31 Not only was the central issue of what caused S.H.'s injuries sharply disputed by directly conflicting expert testimony, but the impact of the erroneously admitted evidence was greater because it involved putting a defenseless child in danger. *Id.* at ¶ 67 (The danger created by erroneously admitting evidence of prior bad acts "is especially great when the evidence involves bad acts against children."). The car-chase incident was not an act specifically directed against a child. But the evidence that Harris attempted to hit an adult with her car and put an infant at risk by doing so portrayed Harris as a person who, when angry, loses control and disregards how her actions may affect others, specifically children. Indeed, although the prosecutors did not refer to the car-chase incident in opening or closing arguments, they did use the incident to specifically rebut Harris's sister's trial testimony that Harris was a loving and good mother to S.H. and her own two children. And the theme of Harris's frustration and anger, and its impact on her behavior, continued through the prosecution's initial and rebuttal closing arguments.

¶ 32 We recognize that, unlike *Casias* where Casias was at home alone with the baby, the prosecution here introduced non-circumstantial evidence about what caused S.H.'s injuries on the morning of August 22. Through L.L.'s testimony, the testimony of child hearsay witnesses to whom L.L. made statements after S.H. died, and video of L.L.'s forensic interview, the prosecution introduced L.L.'s statements that on the morning of August 22 Harris was upset with S.H., threw S.H. down the stairs, and was "whooping" him. However, understandably based on L.L.'s age, this testimony was often un-

clear, confusing, and difficult to follow. Ultimately, it was nearly impossible to discern whether L.L.'s statements about what happened to S.H. were about what happened to him during the July 25 accidental fall or the August 22 incident which formed the basis of the charges. In addition, both L.L. and O.W. gave several differing accounts of what happened on the morning of August 22 to different people at different times, making their various accounts less credible.

¶ 33 We are aware of the many challenges inherent in child-witness testimony. However, where, as here, that testimony is the only non-circumstantial evidence presented regarding the cause of S.H.'s injury, those inherent challenges cannot simply be dismissed because they may be understandable or anticipated. Instead, we must consider the shortcomings of child-witness testimony when judging the strength of the prosecution's evidence. Here, the nature of the child-witness evidence combined with the sharply conflicting expert testimony as to the cause of S.H.'s injuries leads us to conclude that the prosecution's case was not so strong that we are fairly assured that the improperly admitted evidence did not substantially sway the jury to its verdict. *See id.* at ¶ 69.

¶ 34 We also recognize that the jury found Harris guilty of child abuse—resulting in death based on two alternative theories of liability: directly causing S.H.'s injuries or permitting him to be placed in a situation that posed a threat of injury. This does not alter our conclusion that there was a reasonable probability the erroneously admitted evidence contributed to her conviction.

¶ 35 For example, if the jurors had, as requested by the prosecution, (1) found Harris guilty of child abuse—resulting in death based only on the theory that she permitted S.H. to be unreasonably placed in a situation that posed a threat to his life and (2) so found based only on evidence that she waited too long to take S.H. to the hospital, admitting the car-chase evidence would have been harmless error. In that situation, the central issue in the case that the medical experts sharply disputed (what type of impact caused

the fatal hematoma) would have been irrelevant. Instead, Harris's culpability would have been based only on waiting too long to seek medical treatment for the initial injury, regardless of how that injury occurred. Without a sharp dispute about the central issue in the case, the case would not have been close, and the admission of the car-chase incident would have been harmless as a result.

¶ 36 But, the jury indicated that it found Harris guilty of child abuse—resulting in death because she both directly caused S.H.'s injury *and* permitted him to be placed in a situation that posed a threat of injury. And it is impossible for us to know what evidence the jury relied on in making those findings. Therefore, it is still reasonably probable that the car-chase incident contributed to Harris's conviction, and the erroneous admission of that evidence was not harmless.

### III. Other Issues

¶ 37 Harris asserts that several of the trial court's other rulings were erroneous. Because we reverse and remand for a new trial, and reviewing these alleged errors would require us to analyze evidence and circumstances that may be different at a new trial, we do not address these alleged errors. However, to give the trial court guidance for the new trial, we do comment on Harris's argument that she was entitled to a unanimity instruction.

¶ 38 Harris argues that because the prosecution introduced evidence of multiple discrete acts that could have each supported a conviction for child abuse—resulting in death under either theory of criminal liability, she was entitled to an instruction requiring the jury to agree on the specific act that supported the conviction.[2] According to Harris, such an instruction was necessary to ensure that the jury's verdict was unanimous.

¶ 39 A jury verdict must be unanimous, § 16–10–108, C.R.S.2014, and a trial court must properly instruct the jury to ensure that a conviction is the result of a unanimous verdict, *see People v. Childress*, 2012 COA 116, ¶ 28, —— P.3d ——, (cert.

---

2. The prosecution argued that throwing S.H. down the stairs or the delay in getting him to the hospital could each support the child abuse—resulting in death charge.

*granted on other grounds* June 24, 2013): On the one hand, in a case where there is evidence of multiple discrete acts of child abuse and any one of those acts could support a guilty verdict on the single charged child abuse count, the court should provide the jury with an instruction "requiring it to agree on the act supporting the conviction or find that [the] defendant had committed every alleged act of child abuse." *Childress,* ¶ 43. On the other hand, if all of the alleged criminal acts occur in a single transaction, a unanimity instruction may not be necessary. *See Melina v. People,* 161 P.3d 635, 639–40 (Colo.2007); *People v. Perez–Hernandez,* 2013 COA 160, ¶ 56, 348 P.3d 451.

¶ 40 Because different evidence may be presented at a new trial, we cannot decide whether the evidence of child abuse that is presented at the new trial will comprise a single transaction or several discrete acts of alleged child abuse. We note the relevant law only to assist the trial court should the issue arise at the new trial.

### IV. Conclusion

¶ 41 The judgment of conviction is reversed and the case is remanded to the trial court for a new trial.

Terry and Nieto *, JJ., concur

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

