UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

<table>
<tr><td>

UNITED STATES OF AMERICA,
<i>Plaintiff-Appellee,</i>

v.

WILLIS MARK HAYNES,
<i>Defendant-Appellant.</i>

</td><td>No. 00-4675</td></tr>
</table>

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CR-98-520-PJM)

Argued: September 26, 2001

Decided: November 19, 2001

Before WIDENER and WILKINS, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Joshua R. Treem, SCHULMAN, TREEM, KAMIN-KOW, GILDEN & RAVENELL, P.A., Baltimore, Maryland, for Appellant. Deborah A. Johnston, Assistant United States Attorney, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Stephen S. Schenning, United States Attorney, Sandra Wilkinson, Assistant United States Attorney, Greenbelt, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Following a jury trial, Willis Mark Haynes (Haynes) was convicted of, *inter alia*, three counts of first-degree murder, 18 U.S.C. § 1111(a), three counts of kidnapping, *id.* § 1201(a), and three counts of using a firearm during and in relation to a crime of violence, *id.* § 924(c)(1). Haynes received concurrent life terms for the first-degree murder and kidnapping counts, and received a forty-five year consecutive sentence for the firearm counts. On appeal, Haynes challenges his convictions and sentences. We affirm.

### I

### A

On the evening of January 26, 1996, Haynes, Dustin John Higgs (Higgs), and Victor Gloria (Gloria) left Higgs' apartment in Higgs' Mazda MPV and went to Washington, D.C. There, the trio picked up Tamika Black (Black), Tanji Jackson (Jackson), and Mishann Chinn (Chinn) and returned to Higgs' apartment in Laurel, Maryland. As the group was listening to music and while Haynes, Higgs, and Gloria were consuming alcohol and smoking marijuana, a heated argument broke out between Higgs and Jackson, which caused Jackson to retrieve a knife from the kitchen. Haynes attempted to diffuse the situation, but the argument continued. After Jackson told Higgs she was going to "get somebody to **** him up," (J.A. 507), the women left the apartment, but the men remained. Higgs was at the patio door looking out at the women as they left, Gloria was on the couch, and Haynes was across the room near the kitchen.

Higgs, angered by the comment Jackson made before leaving, observed that one of the women was writing down his Mazda MPV's license plate number and commented that the woman writing down

his vehicle's license plate number knew "a lot of niggers," (J.A. 508), a comment interpreted by Gloria as meaning she knew people who could harm Higgs. Higgs said "come on," *id.*, got his coat, and pulled a .38 caliber firearm out of a drawer in a nightstand next to the couch. Haynes, Higgs, and Gloria then left the apartment and got into the Mazda MPV.

With Higgs driving, Haynes in the passenger seat, and Gloria in the seat behind the driver, Higgs drove the vehicle toward the exit of the apartment complex, stopping next to where the women were walking on the side of the road. Higgs told Haynes to tell the women to get into the vehicle. Although it is unclear what Haynes said to the women, the women got into the back seat of the vehicle.

Shortly after leaving the apartment complex, Higgs drove the vehicle onto Route 197, heading toward the Baltimore-Washington Parkway. Gloria was intoxicated and experiencing motion sickness during the drive, so he attempted to fall asleep. The women spoke to each other in the back seat and Haynes and Higgs carried on a conversation in the front seat.

Higgs drove the vehicle past the Baltimore-Washington Parkway exit, the exit which would have taken the party on a direct route to Washington, D.C. Continuing on Route 197, Higgs drove the vehicle into the Patuxent Wildlife Research Center, a federal property falling within the jurisdiction of the United States Park Police (USPP). Higgs stopped the vehicle on Route 197 in an area of woods, where there were no streetlights and it was completely dark. Higgs told the women to get out of the vehicle, and the women complied. Higgs then handed the .38 caliber firearm to Haynes and told him "you better make sure they're dead." (J.A. 1066). Haynes exited the vehicle and fired five shots, killing all three women.

Haynes immediately got back into the vehicle, and Higgs drove the vehicle to a park along the Anacostia River, where the .38 caliber firearm was thrown into the river. Higgs then drove the vehicle back to his apartment, where the men wiped the windows and furniture to remove fingerprints and threw out videotapes and other items which the women might have touched.

At approximately 4:30 a.m. on January 27, 1996, an individual traveling on Route 197 observed the bodies and reported his observations to a USPP officer. The USPP officer responded and observed the bodies of three women strewn across the shoulder and roadway of Route 197. An appointment book belonging to Jackson was discovered on the scene. Written on one page was "13801/Mazda/769329M." (J.A. 426). Maryland motor vehicle records established that license plate 769329M was for a Mazda MPV registered to Higgs. The number 13801 corresponded to the address of Higgs' apartment, 13801 Briarwood Drive, Laurel, Maryland.

Two residents of the apartment complex where Higgs lived observed, between 3:30 and 4:00 a.m. on January 27, 1996, three women, matching the descriptions of the three victims, walking behind their buildings and coming from the general area of Higgs' apartment.

On October 5, 1998, based on a federal complaint charging him with distribution of cocaine base, Haynes was arrested. Following his arrest, Haynes made oral, and gave written statements implicating him in the murders of the three women.

While Haynes was in custody for the federal drug charge on which he was arrested, he began to confide in another inmate, Gerald Vaughn (Vaughn). Haynes told Vaughn he used a ".38" to kill the "bitches." (J.A. 838-39). Haynes also told Vaughn that he committed the murders because one of the women owed some money (a drug debt) to him and his cousin. Further, Haynes told Vaughn that he should have killed Gloria.

B

On December 20, 1999, a federal grand jury sitting in the District of Maryland, by way of a second superseding indictment, indicted Haynes and Higgs on charges of, *inter alia*, first-degree murder, 18 U.S.C. § 1111(a), kidnapping, *id.* § 1201(a), and using a firearm during and in relation to a crime of violence, *id.* § 924(c)(1). The government filed a notice of intent to seek the death penalty for the first-degree murder and kidnapping counts. *Id.* § 3593(a).

Prior to trial, Haynes moved to suppress statements he made to the police, as well as all evidence obtained as a result of those statements. Following a hearing on the motion, the district court denied the motion.

Haynes' case was severed from Higgs' case, and Haynes was tried first. Following a jury trial, the jury returned guilty verdicts on all counts, and the case proceeded to the penalty phase of the trial, where the jury heard evidence on aggravation and mitigation of the capital counts. After the penalty phase of the trial, the jury was unable to reach a unanimous verdict relating to the sentence. On August 24, 2000, the district court sentenced Haynes to concurrent life terms for the first-degree murder and kidnapping counts and to a forty-five year consecutive sentence for the firearm counts. Haynes noted a timely appeal.

## II

Haynes makes several arguments attacking the district court's decision to deny his motion to suppress statements he made to the police following his arrest as well as all of the evidence obtained as a result of those statements. Before we address Haynes' meritless arguments, we set forth the facts surrounding his statements and the applicable law.

## A

On October 1, 1998, FBI Special Agent Bradlee Sheafe (Agent Sheafe) met with USPP officers Robert Rule (Lieutenant Rule) and Joseph Green (Detective Green) to formulate a strategy for arresting Haynes. The officers planned to arrest Haynes on an outstanding federal complaint charging him with distribution of cocaine base, but interrogate him about his relationship with Higgs and the murders of the three women.

At approximately 9:30 a.m. on October 5, 1998, Haynes was arrested at his residence in Bowie, Maryland on the federal complaint charging him with distribution of cocaine base. Following his arrest, Haynes was transported to the FBI's office in Calverton, Maryland,

arriving at approximately 10:10 a.m. After securing Haynes in an interview room at about 10:20 a.m., the arresting agents, Special Agents Louis Luciano and Gerald Dougher, had no further contact with him.

Haynes remained alone in the interview room for approximately one hour and twenty minutes. According to Agent Sheafe, the interview room was designed to create the impression that it was dedicated to a "massive investigation" of Haynes. (J.A. 1104-05). The interview room contained several boxes labeled "Haynes Homicide Investigation." (J.A. 199-200). The boxes in fact did not contain materials related to an investigation of Haynes; rather, they contained miscellaneous papers from the FBI's Calverton office. Hung on the walls of the interview room were posted copies of newspaper articles and photographs about the murders and the three women and their families.

At approximately 11:40 a.m., Agent Sheafe, who was the case agent on the drug investigation for which Haynes was arrested, entered the interview room. After inquiring if Haynes needed anything to eat or drink or needed to use the restroom facilities, Agent Sheafe obtained biographical information from Haynes regarding himself and his wife, Latonya Rochelle Haynes, which, according to Agent Sheafe, was necessary to process Haynes on the federal drug charge. After allowing Haynes to use the restroom facilities, Agent Sheafe then left Haynes alone in the room.

At approximately 12:10 p.m., Agent Sheafe, Lieutenant Rule, and Detective Green entered the interview room. After introductions, Lieutenant Rule commented that it had been a while since he had seen Haynes. Lieutenant Rule noted that there had been several changes in Haynes' life since the last time they had talked; Haynes had gotten married, had a new car, and had moved into a new residence. Lieutenant Rule and Haynes talked about Haynes' brother, who had been institutionalized for some health reasons.

The officers then advised Haynes that they wanted to bring some items to his attention, but specifically advised Haynes that they were not asking him any questions and did not want him to comment. The first item brought to Haynes' attention was a telephone record showing a phone call from Higgs' phone to a friend of Haynes near the

time of the murders. The second item was a transcript from a plea hearing, which involved Higgs' guilty plea to a charge arising from a separate shooting (the Cherry Lane shooting) involving both Haynes and Higgs.[1] During the plea hearing, Higgs disavowed using a .38 caliber firearm; rather, Higgs claimed Haynes had used the .38 caliber firearm. Finally, Lieutenant Rule showed Haynes a fabricated ballistics comparison purporting to match up the bullets from the Cherry Lane shooting with the bullets used in the murders of the three women. At the conclusion of the officers' twenty-minute presentation, Haynes asked for some cigarettes and to speak with Detective Green alone. In deference to Haynes' request, Agent Sheafe and Lieutenant Rule left Haynes alone with Detective Green and went to find some cigarettes.

For approximately fifteen minutes, Detective Green remained alone in the interview room with Haynes. During this time, Haynes asked Detective Green what he should do. Detective Green responded that he should tell the truth. Detective Green discussed generally how Haynes' whole life was a lie, that he had lied so much he could not keep his lies straight, and that telling the truth would make him feel much better. Haynes agreed and said that he was getting "paranoid," thinking the police were everywhere. (J.A. 270). Haynes asked Detective Green about Wayne Perry (Perry) and asked how Perry avoided the death penalty.[2] Haynes indicated that Perry was his "hero." *Id.* Detective Green then asked Haynes if he was "ready," and Haynes stated that he was ready. *Id.* Detective Green left the interview room at approximately 12:45 p.m.

At 12:50 p.m., Agent Sheafe, Lieutenant Rule, and Detective Green reentered the interview room, and Haynes was given the cigarettes which he had previously requested. Using a USPP advice of rights card, the officers orally advised Haynes of his *Miranda*[3] rights. Haynes read his *Miranda* rights aloud, acknowledged understanding them, and answered orally and in writing the questions on the reverse

---

[1]The Cherry Lane shooting occurred on December 10, 1995.

[2]According to Detective Green, Perry had been convicted of five first-degree murders in Washington, D.C.

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

side of the card, affirmatively stating his understanding and his willingness to be interviewed.

The interview commenced with Haynes orally describing his relationship with Higgs. In the first ninety minutes, Haynes described how they met and the nature of their drug dealing relationship. After Haynes completed his history, Lieutenant Rule asked him to describe the events of January 26 and 27, 1996. Haynes told them that he was at Higgs' apartment and that Higgs brought three women over to the apartment. According to Haynes, there was a fight between Higgs and one of the women. After the fight, Higgs left to take the women home. Higgs returned and told Haynes that he had killed the women.

At approximately 2:30 p.m., Haynes was asked if he wanted a drink and Haynes responded in the affirmative. After receiving a soda, Lieutenant Rule told Haynes "this is all very convenient for you that, you know, you weren't present for the killings, that you were advised later about them, but we both know that's not what happened. We both know that you were indeed in the van and present for the homicides." (J.A. 223-24). In response, Haynes acknowledged that he had been in the vehicle with Higgs and that he originally thought that Higgs was going to take the women home. Instead, Haynes said that Higgs went down a dark road, pulled over, ordered the women out of the vehicle, and then got out and shot the women. Then, according to Haynes, they went to the Anacostia River and threw the firearm into the river. Haynes also said he was willing to take the officers to the location where the firearm had been thrown into the river.

At 3:55 p.m., Agent Sheafe proposed a break and suggested they have something to eat. Haynes indicated that he would like to eat a "Big Mac." (J.A. 1027). The officers left the interview room and returned at approximately 4:15 p.m. with the food, including the Big Mac.

At 4:40 p.m., Haynes read the handwritten preamble to his first written statement, which was a reminder of his *Miranda* rights, and after acknowledging his rights, Haynes began writing a statement. It took approximately one hour to complete the written statement, including the question and answer portion. In this first written statement, Haynes maintained that he was partying with the three women

at Higgs' apartment; that Higgs had a fight with one of the women; that Higgs offered to take them home; that Higgs pulled over on a dark road, got out of the vehicle and shot all three women; and that after the shooting Higgs drove to a place where the firearm was thrown into the Anacostia River. Originally, when describing the murders, Haynes wrote, "I ran back to the van." (J.A. 154). During the question and answer period, Lieutenant Rule asked Haynes why he had written "I ran back to the van," to which Haynes responded that it was a mistake and changed the "I" to "he." (J.A. 1041). This first written statement was finished at approximately 5:50 p.m. The statement ended with Haynes' acknowledgment that the statement was a voluntary statement and that no promises had been made to him.

When Haynes' first written statement was concluded, Agent Sheafe, Lieutenant Rule, and Detective Green went to interview Gloria, who was being held in another room at the FBI Calverton office. At 6:20 p.m., the officers reentered the interview room and advised Haynes that Gloria was giving a statement admitting that, contrary to Haynes' statement, he (Gloria) was in the vehicle at the time of the murders. In response, Haynes stated that it was possible Gloria was there, but he did not remember. The officers then left the interview room.

At 7:45 p.m., Agent Sheafe reentered the interview room and questioned Haynes regarding his drug activity, which was the subject of the federal drug charge. Haynes provided an oral statement regarding his drug transactions and Gloria's involvement in them. At 8:50 p.m., Agent Sheafe left the interview room. He returned at 9:20 p.m. with Detective Green. Haynes agreed to provide a written statement concerning his drug trafficking activities. Once again, the written statement began with a preamble advising Haynes of his *Miranda* rights, which he acknowledged. The second written statement was limited to Haynes' drug trafficking activities that resulted in his arrest. The statement was completed at 10:03 p.m. and ended with an acknowledgment of the statement's voluntariness. At 10:10 p.m., Haynes was fingerprinted and photographed.

At 10:51 p.m., Haynes was driven to Anacostia Park, arriving at 11:20 p.m. Haynes directed the officers to the location where the murder weapon was thrown into the Anacostia River. At 11:48 p.m., they

left the park. Knowing that Gloria had given a statement about the murders which was similar to Haynes but identifying Haynes as the shooter, the officers wanted to clarify Haynes' written statement regarding the murders. Given the late hour, the officers took Haynes to the USPP Greenbelt Substation, arriving at approximately 12:10 a.m.

At 12:20 a.m., Haynes was asked if he needed anything, and he responded that he would like some cigarettes and a soda. He was given both. The officers then told Haynes they believed that he had gotten out of the vehicle at the murder scene and that he was the shooter. To support these beliefs, the officers falsely told Haynes that his footprint had been found at the murder scene. At this time, Haynes became visibly upset, holding his stomach and shaking. He then orally admitted that he had shot the women because he was afraid that Higgs would kill him if he did not kill the women.

Around 1:05 a.m., Haynes was asked to put his admission in writing. Haynes read aloud the preamble to his third written statement and wrote that he originally lied about who had been the shooter and that he killed the women because he was afraid that Higgs would kill him if he did not. At approximately 1:33 a.m., Haynes completed the written statement, which again ended with his acknowledgment of the statement's voluntariness. After a break to use the restroom facilities, a written question and answer statement was commenced, and the statement was completed at 2:20 a.m. The question and answer segment of the statement was signed by Haynes and included an acknowledgment that the statement was voluntary.

B

In order to protect the right granted by the Fifth Amendment that "no person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V, the Supreme Court in *Miranda* adopted prophylactic procedural rules that must be followed during custodial interrogations. *Miranda*, 384 U.S. at 444. The Court held that, before a suspect in custody can be interrogated, the suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or

appointed." *Id.* In general, any statements elicited from a suspect in violation of these rules are inadmissible in the government's case-in-chief. *Stansbury v. California*, 511 U.S. 318, 322 (1994) (*per curiam*).[4]

The procedural safeguards prescribed by *Miranda* only apply "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*per curiam*). A person is "in custody" for purposes of *Miranda* if the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest. *Stansbury*, 511 U.S. at 322. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted).

The admissibility of a defendant's statement also turns on whether the statement was voluntary under the Due Process Clause of the Fifth Amendment. *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (*en banc*). The voluntariness inquiry under the Due Process Clause of the Fifth Amendment requires us to determine "whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).

When reviewing a motion to suppress statements of a defendant on the ground that they were made during a custodial interrogation without *Miranda* warnings or on the ground that the statement was involuntary, we must accept the district court's findings of fact unless clearly erroneous, but we review *de novo* whether the statements violated the dictates of *Miranda* or were involuntary. *Braxton*, 112 F.3d at 781.

---

[4]In *Dickerson v. United States*, 530 U.S. 428, 444 (2000), the Supreme Court held that *Miranda* announced a constitutional rule that Congress could not overrule legislatively.

C

Haynes asserts that his pre-*Miranda* statements were inadmissible because they were given without the benefit of *Miranda* warnings. According to Haynes, the violation of *Miranda* resulted in the need to exclude all subsequent statements as fruits of the poisonous tree. Haynes' pre-*Miranda* statements were as follows: (1) booking information, including information obtained about his wife; (2) Haynes' acknowledgment that he had called his friend's home from Higgs' apartment near the time period of the murders; and (3) statements he made to Detective Green regarding Perry.

With regard to the booking information, Haynes argument fails for the simple reason that routine booking information does not constitute interrogation. *United States v. D'Anjou*, 16 F.3d 604, 608-09 (4th Cir. 1994). Clearly, the questions asked by Agent Sheafe regarding Haynes' background, including identifying information, are precisely the type of booking information which is outside the realm of *Miranda*.

With regard to Haynes' acknowledgment that he had called his friend's home from Higgs' apartment near the time period of the murders, this statement was not made during an interrogation of Haynes. As noted earlier, interrogation has been defined as words or actions by the police which are designed to illicit an incriminating response. *Innis*, 446 U.S. at 301. In order to implicate *Miranda*, the officer's words must be direct interrogation or the functional equivalent thereof. *Id.* at 300-01.

In this case, the officers specifically instructed Haynes not to say anything, but just listen. While the officers wished to advise Haynes of why they were there and the progress they had made in their investigation, they made it clear that they were not seeking any responses from him. Consequently, Haynes' statement was spontaneously and voluntarily made and was not the result of any interrogation.

With regard to Haynes' statements made to Detective Green concerning Perry, when Haynes requested to speak to Detective Green alone, the officers honored his request. During that fifteen-minute interval, it was Haynes who asked questions and the detective who

responded. The only question asked by Detective Green came at the end of the fifteen minutes when Detective Green asked Haynes if he was ready, and Haynes responded affirmatively. This conversation was simply not an interrogation as there was nothing said by Detective Green which could be construed as a question designed to obtain an inculpatory response.

Given that the pre-*Miranda* statements were not the result of any interrogation, Haynes' argument that his pre-*Miranda* statements were inadmissible is without merit.[5]

### D

Haynes also contends that his *Miranda* waivers were invalid, rendering his post-*Miranda* statements inadmissible. We disagree.

To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, we must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation. *Braxton*, 112 F.3d at 781. In *Braxton*, we noted that the "mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." *Id.* at 780.

Our independent review of the record does not establish that Haynes' post-*Miranda* warning statements were involuntarily made. Haynes was repeatedly advised of his *Miranda* rights, and each written statement included an acknowledgment of his *Miranda* rights and the voluntariness of his statements. *Cf. North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (holding that an express written or oral waiver is usually strong evidence of the validity of the defendant's waiver).

---

[5]To the extent that Haynes presses the argument that his pre-*Miranda* statements were inadmissible because they were involuntary under the Due Process Clause of the Fifth Amendment, we reject this argument. For obvious reasons, the circumstances surrounding the pre-*Miranda* statements do not suggest that Haynes' "will was 'overborne' or his 'capacity for self-determination critically impaired.'" *Pelton*, 835 F.2d at 1071 (quoting *Schneckloth*, 412 U.S. at 225).

Although Haynes' interview lasted, on and off, for sixteen hours, Haynes, who was familiar with the criminal justice system, was cooperative throughout the interview and was described as alert and congenial. Throughout the sixteen-hour period, numerous breaks were taken, Haynes was repeatedly asked if he needed anything, and his requests for food, drinks, cigarettes or to use the restroom facilities were always honored. There is no evidence that he was under the influence of drugs or alcohol. Further, there is no evidence that the officers used violence or improper threats or promises to elicit Haynes' statements.[6] Although the officers made several false statements about the evidence they had obtained and the interview room created the impression that there was an extensive investigation of Haynes, this evidence, without more, does not render an otherwise voluntary confession involuntary. *Cf. Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding interrogator's misrepresentation to suspect that his co-suspect had already confessed did not render suspect's subsequent confession involuntary); *Lucero v. Kerby*, 133 F.3d 1299, 1310-11 (10th Cir. 1998) (officer's false statement that defendant's fingerprint had been recovered at the crime scene did not render an otherwise voluntary statement involuntary); *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994) (holding officer's false statements that police had matched defendant's fingerprints to fingerprints found in victim's van and that two witnesses had identified defendant did not render defendant's confession involuntary); *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992) ("Of the numerous varieties of police trickery . . . a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary."). In this case, the misrepresentation during the initial pre-*Miranda* meeting regarding the ballistics match, and the inference from the boxes that there was an extensive investigation of Haynes, while likely to give a per-

---

[6]Haynes argues that Detective Green made an implied promise when, in response to Haynes' question, he advised Haynes that Perry had escaped the death penalty by admitting his guilt and accepting responsibility for what he had done. This argument lacks merit because we have held that statements similar to that made by Detective Green do not constitute a promise, implied or otherwise. *See, e.g.*, *Braxton*, 112 F.3d at 783 (holding that investigator's statement "you're not coming clean, . . . you can do five years because you're not coming clean," did not constitute a threat or promise).

son concern, were not of such a nature as to overbear one's free will. Likewise, the misstatement regarding Haynes' footprint at the scene of the crime, under circumstances including Haynes' written acknowledgment of the voluntariness of his three written statements, cannot be said to have critically impaired his free will.[7]

  In summary, the district court did not err when it denied Haynes' motion to suppress.[8]

---

[7]According to Agent Sheafe, while he was obtaining biographical information from Haynes, Haynes requested to use a telephone. According to Agent Sheafe, he denied Haynes' request because, in his experience,

> oftentimes some sort of code or a plan has been preestablished between conspirators in a drug case to make a telephone call.

> I am personally aware of one instance where an arrestee was allowed to make a telephone call because he told the arresting officer that were he not to make a telephone call, no one would pick his child up from school. The arresting officer allowed him to make that phone call and it sounded to the officers, though, he were indeed making that telephone call when in fact he had advised a co-conspirator to rid his residence of some evidence through the use of that phone call.

> In my judgment and experience, it would have been improper for me to allow Mr. Haynes to make a phone call at that time and in that situation.

(J.A. 187-88). Agent Sheafe testified that it would have made a difference if Haynes indicated that he wanted to call a friend, a family member, or an attorney. While we find Agent Sheafe's denial of Haynes' request to use a telephone militates slightly in favor of a finding that Haynes' statements were involuntary, given the overwhelming evidence in the record that Haynes' statements were voluntary, Agent Sheafe's refusal does not call into question the voluntariness of Haynes' statements.

[8]We have reviewed Haynes' argument that the officers' failure to present him before a magistrate within six hours of his arrest, Fed. R. Crim. P. 5(a), 18 U.S.C. § 3501(c), rendered his oral and written statements inadmissible and find the argument to be without merit.

### III

Haynes argues that the district court abused its discretion when it admitted, pursuant to Rule 404(b) of the Federal Rules of Evidence, evidence concerning his prior drug trafficking activities and the Cherry Lane shooting.[9] At trial, the district court allowed this evidence to be admitted for the limited purpose of showing: (1) Haynes' relationship with Higgs and Gloria in drug trafficking activity; (2) Haynes' ability to use a firearm; and (3) Haynes' intent to use a firearm.

With regard to Haynes' prior drug trafficking activities, Gloria testified that he and Haynes had dealt drugs together prior to their arrests. In his confession, Haynes confessed that he had a drug dealing relationship with Higgs and Gloria. Haynes also told Vaughn that he was involved in selling drugs with Higgs and that the murders were committed because of a drug debt owed to him and his cousin by one of the women.[10]

With regard to the Cherry Lane shooting, Rodney Simms testified that both Haynes and a man independently identified as Higgs fired weapons at him at close range. Based on the position of Haynes and Higgs when firing, as well as the location of the spent shells, the evidence in the record suggests that Haynes had a 9 mm. firearm and Higgs had a .38 caliber firearm.

We need not decide whether the evidence concerning Haynes' prior

---

[9]Rule 404(b) provides in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b).

[10]The government also introduced evidence concerning a search warrant that was executed at Higgs' apartment on March 21, 1996. During the search, the officers recovered a semi-automatic firearm, boxes of ammunition, and cocaine base.

drug trafficking activities and the evidence concerning the Cherry Lane shooting were admissible under Rule 404(b) because, even if the evidence was not, any error was harmless beyond a reasonable doubt. In considering whether a nonconstitutional error is harmless, the

> proper test . . . is whether we, in appellate review, can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error. In applying this test, we must be mindful that it does not ask simply whether we believe that irrespective of the error there was sufficient untainted evidence to convict but, more stringently, whether we believe it highly probable that the error did not affect the judgment.

*United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994) (citations and internal quotation marks omitted).

We have found it helpful in making this assessment to examine three factors: "(1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case." *Id.* Applying these factors, we conclude that the assumed errors in the instant case were harmless.

The evidence concerning Haynes' prior drug trafficking activities and the evidence concerning the Cherry Lane shooting went to a central issue at trial. While this evidence relates to Haynes' character, the evidence also made it more probable that Haynes participated in the crimes for which he was charged. Thus, because this evidence went to a central issue at trial, the evidence weighs in favor of a harmful error finding. However, the other two factors, mitigating factors and closeness of the case, weigh in favor of finding harmless error.

As for mitigating factors, the district court gave a cautionary instruction to the jury. Cautionary instructions, which jurors are presumed to follow, *United States v. Love*, 134 F.3d 595, 603 (4th Cir. 1998), generally alleviate any prejudicial impact from the challenged evidence. *United States v. Powers*, 59 F.3d 1460, 1468 (4th Cir. 1995).

The third and most crucial factor, the closeness of the case, *Ince*, 21 F.3d at 584, also weighs in favor of finding harmless error. In evaluating this factor, we look at the other evidence to see if it was sufficient to convict, as well as "whether it [was] sufficiently powerful in relation to the tainted evidence to give fair assurance that the tainted evidence did not substantially sway the jury to its verdict." *United States v. Urbanik*, 801 F.2d 692, 699 (4th Cir. 1986) (citations and internal quotation marks omitted).

The case was not close. The overwhelming evidence presented at trial establishes that Haynes helped kidnap and murdered the three women, and used a firearm during and in relation to those offenses. First, Haynes' confession goes into great detail outlining the circumstances surrounding the crimes. In all critical respects, Gloria's testimony was consistent with Haynes' confession. Further, the government's case was bolstered by Vaughan's testimony. This evidence is "sufficiently powerful in relation to the tainted evidence to give fair assurance that the tainted evidence did not substantially sway the jury to its verdict." *Id.* (citations and internal quotation marks omitted).

For these reasons, we conclude that, even if the district court erred in admitting the evidence concerning Haynes' prior drug trafficking activities and the evidence concerning the Cherry Lane shooting, any error was harmless.

IV

Haynes also argues that the district court erred in imposing a consecutive sentence of twenty years' imprisonment on Count Ten (use of a firearm during and in relation to the murder and kidnapping of Chinn) and a consecutive sentence of twenty years' imprisonment on Count Fifteen (use of a firearm during and in relation to the murder and kidnapping of Jackson). In particular, Haynes asserts that these counts of conviction do not constitute a "second or subsequent conviction" under 18 U.S.C. § 924(c)(1)[11] because Count Five (use of a

---

[11]The relevant statute under review, 18 U.S.C. § 924(c)(1), provides, in pertinent part:

firearm during and in relation to the murder and kidnapping of Black), the first or predicate conviction, occurred as part of the same criminal episode as Counts Ten and Fifteen. We disagree.

Haynes points to nothing in the language of the statute to support his statutory construction. The statute speaks in terms of "conviction," not criminal episode. This textual approach to § 924(c)(1) is compelled by the Supreme Court's interpretation of that statutory provision in *Deal v. United States*, 508 U.S. 129 (1993).

In *Deal*, the defendant, Deal, who had committed six armed robberies at different banks on different dates within a four-month period was charged in one indictment with, *inter alia*, six bank robberies and six counts of violating of § 924(c)(1). *Deal*, 508 U.S. at 130. Upon Deal's conviction on all charges, he was sentenced to five years imprisonment on the first § 924(c)(1) count and to twenty years on each of the five other § 924(c)(1) counts, each term to run consecutively. *Deal*, 508 U.S. 131. The issue before the Supreme Court was "whether [Deal's] second through sixth convictions under § 924(c)(1) in [a] single proceeding arose '[i]n the case of his second or subse-

> Whoever, during and in relation to any crime of violence . . . uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence . . . be sentenced to imprisonment for five years . . . . In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years . . . . Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence . . . in which the firearm was used or carried.

18 U.S.C. § 924(c)(1). After Haynes committed the § 924(c)(1) offenses, § 924(c)(1) was amended, Pub. L. No. 105-386, 112 Stat. 3469. Under the new version of § 924(c)(1), a second or subsequent conviction carries a mandatory consecutive sentence of twenty-five years' imprisonment. 18 U.S.C. § 924(c)(1)(C)(i). Haynes was sentenced under the version of § 924(c)(1) in effect when he committed the offenses.

quent conviction' within the meaning of § 924(c)(1)." *Deal*, 508 U.S. at 131.

The Court rejected Deal's argument that, because "conviction" could mean either the finding of guilt or the entry of a final judgment of guilt, § 924(c)(1) should be limited to the latter under the rule of lenity. *Deal*, 508 U.S. at 131-37. The Court concluded that the only coherent reading of the language was that the word "conviction" used in the statute referred to a finding of guilt, and not to a final judgment, *id.* at 132, and that, because "findings of guilt on several counts are necessarily arrived at successively in time," *id.* at 133 n.1, a finding of guilt on each count after the first was "second or subsequent." *Id.* at 132-37.

The language and reasoning of *Deal* compel us to reject Haynes' argument. If we held otherwise, we would have to limit the statutory language "second or subsequent conviction" to exclude a conviction that arises out of the same criminal episode. Thus, Haynes would have us insert words in the statute which simply are not there. In doing so, Haynes would require us to ignore that Congress specifically commanded that the enhancement would apply to "any" crime of violence without regard to temporal considerations.

Just as the Supreme Court in *Deal* declined to differentiate between convictions embodied in separate judgments and those embodied in separate charges in the same indictment, so, too, we cannot distinguish between criminal acts that occur over a period of time and those that result from the same course of criminal activity. The *Deal* Court was unequivocal in holding that under § 924(c)(1) "conviction" means "the finding of guilt by a judge or jury that necessarily precedes the entry of a final judgment of conviction," and that more than one "conviction" can occur in a single proceeding. *Deal*, 508 U.S. at 131-32. The Court stated: "The present statute . . . does not use the term 'offense,' so it cannot possibly be said that it requires a criminal act after the first conviction. What it requires is a *conviction* after the first conviction. There is utterly no ambiguity in that." *Id.* at 135.

Most courts, including our own, that have had occasion to interpret § 924(c)(1) after *Deal* have required the imposition of a consecutive sentence for a second or subsequent § 924(c)(1) conviction notwith-

standing a factual nexus between the predicate offense underlying the first conviction and the predicate offense underlying the second or subsequent conviction. *United States v. Burnette*, 170 F.3d 567, 572 (6th Cir.) (use of firearm in kidnapping bank employee's family members while employee was taken to bank to facilitate bank robbery and use of firearm in the subsequent bank robbery are two separate offenses to which the § 924(c)(1) sentencing enhancement is applicable), *cert. denied*, 528 U.S. 908 (1999); *United States v. Casiano*, 113 F.3d 420, 424-26 (3d Cir. 1997) (§ 924(c)(1) conviction for kidnapping was subsequent to § 924(c)(1) conviction for carjacking of the same victim in the same criminal episode); *United States v. Floyd*, 81 F.3d 1517, 1526-27 (10th Cir. 1996) (even though carjacking of one victim and kidnapping of another are part of a single criminal offense, second conviction for a § 924(c)(1) with its consecutive twenty-year sentence was proper); *United States v. Andrews*, 75 F.3d 552, 558 (9th Cir. 1996) (rejecting a challenge to a § 924(c)(1) enhancement for a second conviction in a case where the underlying offenses of murder and manslaughter occurred "virtually simultaneously," as part of the same criminal episode); *United States v. Camps*, 32 F.3d 102, 106-09 (4th Cir. 1994) (upholding separate § 924(c)(1) convictions with consecutive terms of five, twenty, and twenty years arising out of a series of acts committed on separate days, all of which were part of the same scheme to preserve the defendant's drug operation from a rival gang); *see also United States v. Luskin*, 926 F.2d 372, 377 (4th Cir. 1991) ("As long as the underlying crimes are not identical . . . then consecutive section 924(c)(1) sentences are permissible."). Some courts have vacated a second or subsequent § 924(c)(1) conviction where the predicate offense underlying the second conviction occurs simultaneously with the predicate offense underlying the first conviction, *see, e.g.*, *United States v. Finley*, 245 F.3d 199, 206-08 (2d Cir. 2001) (consecutive sentence under § 924(c)(1) could not be imposed where the predicate offense underlying the first conviction (distribution of cocaine) and the predicate offense underlying the second or subsequent conviction (possession with intent to distribute cocaine) occurred "simultaneous[ly] or nearly so"); *United States v. Wilson*, 160 F.3d 732, 749 (D.C. Cir. 1998) (consecutive sentence under § 924(c)(1) could not be imposed where same firearm was used to commit simultaneous violent felonies on one victim: first-degree murder and the killing of a witness to prevent him from testifying and

stating that where "there is only one firearm and one use, but two underlying offenses" there is only one § 924(c)(1) violation), or where the predicate offense underlying the second or subsequent conviction is the same predicate offense underlying the first conviction, *see, e.g.*, *United States v. Anderson*, 59 F.3d 1323, 1325-34 (D.C. Cir. 1995) (*en banc*) (holding that multiple § 924(c)(1) convictions could not be linked to the same underlying predicate offense, conspiracy to distribute and possess with intent to distribute cocaine). But, unlike cases similar to *Finley*, *Wilson*, and *Anderson*, the predicate offenses underlying Haynes' § 924(c)(1) convictions are not the same offenses (they involve different victims) and did not occur "simultaneous[ly] or nearly so." *Finley*, 245 F.2d at 207.

In summary, we reject Haynes' argument that the district court erred in imposing a consecutive sentence of twenty years' imprisonment on Count Ten and a consecutive sentence of twenty years' imprisonment on Count Fifteen.[12]

V

For the reasons stated herein, the judgment of the district court is affirmed.[13]

*AFFIRMED*

---

[12]Haynes also argues that, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), he was entitled to pretrial notice that he faced enhanced penalties for a second and third § 924(c)(1) conviction. We have reviewed this argument and find it to be without merit.

[13]We also reject Haynes' challenge to the sufficiency of the evidence supporting his convictions.