UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

No. 03-19

DUSTIN JOHN HIGGS,
          *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CR-98-520-PJM)

Argued: January 20, 2004

Decided: April 20, 2004

Before WILKINS, Chief Judge, and LUTTIG and
TRAXLER, Circuit Judges.

Affirmed by unpublished opinion. Judge Traxler wrote the opinion,
in which Chief Judge Wilkins and Judge Luttig joined.

## COUNSEL

**ARGUED:** Timothy Joseph Sullivan, SULLIVAN & SULLIVAN,
College Park, Maryland, for Appellant. Deborah A. Johnston, Assis-
tant United States Attorney, Greenbelt, Maryland, for Appellee. **ON
BRIEF:** Barbara L. Hartung, Richmond, Virginia, for Appellant.
Thomas M. DiBiagio, United States Attorney, Greenbelt, Maryland,
for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

TRAXLER, Circuit Judge:

Appellant Dustin John Higgs ("Higgs") was convicted of three counts of first-degree premeditated murder, *see* 18 U.S.C.A. § 1111(a) (West 2000), three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id.*, and three counts of kidnapping resulting in death, *see* 18 U.S.C.A. § 1201(a)(2) (West 2000), arising out of the January 27, 1996, murders of three young women in the Patuxent National Wildlife Refuge. He ultimately received nine death sentences. We affirmed. *See United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003). In this appeal, Higgs challenges the district court's denial of his motion for a new trial and new sentencing hearing based upon the government's failure to disclose favorable evidence in contravention of the rule announced in *Brady v. Maryland*, 373 U.S. 83, 87 (1963). For the following reasons, we affirm.

I.

The facts and evidence pertaining to the triple murders in this case are fully set forth in our prior opinion. Thus, we summarize only those facts most pertinent to Higgs's *Brady* claim.

On the evening of January 26, 1996, Dustin John Higgs, Willis Mark Haynes, and Victor Gloria traveled to Washington, D.C., and picked up Tanji Jackson, Tamika Black, and Mishann Chinn. Higgs knew Jackson, and they had arranged dates for Haynes and Gloria with Black and Chinn. The six returned to Higgs's apartment in Laurel, Maryland, to drink alcohol and listen to music. In the early morning hours of January 27, Higgs and Jackson began to argue violently, culminating in Jackson retrieving a knife from Higgs's kitchen. Gloria and Chinn were in the living room with Higgs and Jackson at the time. Haynes and Black were in the bedroom. Upon hearing the commotion, Haynes came out from the bedroom and broke up the fight.

Despite the early morning hour, the three women abruptly left Higgs's apartment on foot. As they were leaving, Jackson "stopped at the door and said something like I am going to get you all f--ked up or robbed" or made "some kind of threat." J.A. 473. Higgs commented to Haynes and Gloria that Jackson "do know a lot of n-----s." J.A. 474. Higgs, who was watching from inside the apartment, saw Jackson stop and appear to write down the license plate number of his Mazda van, and Higgs commented to Haynes and Gloria that Jackson was "writing down [his] sh--." J.A. 474. Higgs then "said f--k that, and grabbed his coat and said come on." J.A. 474. As he was leaving, Higgs retrieved his .38 caliber firearm from the end table drawer and put it in his pocket.

The three men got into Higgs's vehicle and Higgs drove to where the women were walking. At Higgs's direction, Haynes talked the women into getting in the van. Higgs then began driving away from the apartment complex. While en route, Gloria observed Higgs and Haynes, who were sitting in the front seat, leaning towards one another and whispering, but he could not hear what the two were saying. Instead of taking the most direct route to Washington, D.C., Higgs drove into the Patuxent National Wildlife Refuge and pulled over at a secluded location. When one of the women asked if they were trying to "make [them] walk from [t]here," Higgs responded, "something like that." J.A. 482. The women then got out of the van. Higgs handed his .38 caliber pistol to Haynes, who put it behind his back and also exited the vehicle. Within moments, Haynes shot and killed all three women.

Shortly after the killings, the bodies of the three women were discovered strewn about the roadway by a passing motorist. Law enforcement officers found Jackson's day planner at the scene. In it, Jackson had recorded Higgs's nickname ("Bones") and telephone numbers. The notation "13801 'MAZDA' 769GRY" — Higgs's address number and the tag number for his Mazda vehicle — had also been recorded.

After the men left the crime scene, they stopped at a nearby river where they disposed of the gun. They then returned to Higgs's apartment, which they cleaned of any trace of the women's presence that evening, and dropped the trash by a dumpster. Higgs and Haynes then

dropped Gloria off at a fast food restaurant, where he was told by Higgs to "keep [his] mouth shut." J.A. 489. Ultimately, Gloria did not abide by Higgs's order. In the fall of 1998, after he was arrested on federal drug charges, Gloria cooperated with the government in its drug distribution and murder investigations of Haynes and Higgs, ultimately providing eyewitness testimony regarding the murders and the events surrounding the crimes.

On October 5, 1998, Haynes was arrested on a federal complaint for distribution of cocaine base. While in custody, Haynes gave several oral and written statements which largely corroborated Gloria's version of the events that evening. Haynes also admitted that he was the triggerman, but claimed that he shot the women because he was afraid of Higgs.[1]

In December 1998, Higgs and Haynes were jointly indicted for first degree murder, kidnapping, and use of a firearm in the commission

---

[1]The following summary of Haynes's confession is set forth in our opinion affirming the kidnapping, murder, and related convictions of Haynes:

> In [his] first written statement, Haynes maintained that he was partying with the three women at Higgs' apartment; that Higgs had a fight with one of the women; that Higgs offered to take them home; that Higgs pulled over on a dark road, got out of the vehicle and shot all three women; and that after the shooting Higgs drove to a place where the firearm was thrown into the Anacostia River. Originally, when describing the murders, Haynes wrote, "I ran back to the van." During the question and answer period, Lieutenant Rule asked Haynes why he had written "I ran back to the van," to which Haynes responded that it was a mistake and changed the "I" to "he."

*United States v. Haynes*, 26 Fed. Appx. 123, *130, 2001 WL 1459702, at *5 (4th Cir. 2001) (internal citations omitted), *cert. denied*, 535 U.S. 979 (2002). Later, Haynes "orally admitted that he had shot the women because he was afraid that Higgs would kill him if he did not kill the women." *Id.* at 131. In a subsequent written statement, he "wrote that he originally lied about who had been the shooter and that he killed the women because he was afraid that Higgs would kill him if he did not." *Id.* There appears to have been no dispute in either trial that Haynes was, indeed, the triggerman.

of a crime of violence, in connection with the abduction and murders of the three young women. The cases were severed for trial. Haynes's trial began in August 2000. He was convicted of the charges, but the jury was unable to reach a unanimous verdict as to the imposition of the sentence of death. Consequently, the court imposed a sentence of life imprisonment. We affirmed his convictions and sentences on appeal. *See United States v. Haynes*, 26 Fed. Appx. 123, 2001 WL 1459702 (4th Cir. 2001), *cert. denied*, 535 U.S. 979 (2002). Higgs's trial began in September 2000. He was also convicted of the charges. However, at the conclusion of the sentencing phase of his trial, the jury imposed nine death sentences. His convictions and sentences were also affirmed on appeal. *See Higgs*, 353 F.3d at 334.

In the course of preparing his appeal to this court, Higgs's counsel reviewed the district court record from Haynes's trial and discovered that the government had identified two witnesses who had been incarcerated with Haynes at the Charles County Detention Center. Both witnesses professed to have had conversations with Haynes about the triple murders.

The first inmate, Gerald Vaughn, was called to testify at Haynes's trial. Vaughn testified that, shortly after Haynes's arrest in the fall of 1998, Haynes told Vaughn that he and his "cousin" were partners in drug dealing and that the women were murdered because one of them was holding "a quarter of a million dollars" of their drug money.[2] S.J.A 144. Haynes also told Vaughn that he tricked the women into getting into Higgs's van that evening and that Haynes used a .38 caliber weapon to kill them. *See Haynes*, 26 Fed. Appx. at 128.

The second inmate was Kevin Anderson. Although the government attorneys submitted under seal a copy of notes taken by them during an interview with Anderson in May 2000, as well as an outline pre-

---

[2]Although Haynes never named the specific identity of his "cousin," Haynes told Vaughn that his cousin was with him when the women were murdered, that his cousin told Haynes they he "should have killed Vic because Vic was weak," but that Haynes "didn't want to do it because Vic was his friend." Supp.J.A.II. 175. After Haynes "learned that Vic was cooperating in his coke charge, as well as the murder charges, he was . . . saying that he should have killed him." Supp.J.A.II. 175.

pared by the prosecutors in anticipation of questioning Anderson at Haynes's trial, Anderson was never called to testify during Haynes's trial and it appears that no further effort was made by Haynes's counsel to obtain copies of those notes or a *Brady* ruling regarding them. According to the notes, Anderson told the prosecutors that, while he and Haynes were incarcerated together, he witnessed a confrontation between Haynes and another inmate over the use of a telephone. In response to the inmate's comment that "you think [you're] big stuff because you killed [three] women," Haynes replied that "I'll kill whoever the f--- I want to kill." Supp.J.A.I. 124. Anderson also said that Haynes later told him that "one of the girls may have set him up" and he "had to kill her." Supp.J.A.I. 125.

Upon learning of these statements, Higgs moved for a new trial and new sentencing hearing pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and Rule 33 of the Federal Rules of Criminal Procedure. Higgs asserted that the government's failure to identify Anderson as a potential witness and to provide Higgs with a copy of the Anderson interview notes violated his due process rights because Anderson's testimony would have been persuasive evidence that Haynes had his own motive for killing the women and was "equally culpable" with Higgs for the murders.

The district court denied the motion, finding that Anderson's statements would have been neither exculpatory nor of impeachment value in the guilt phase of Higgs's trial. With regard to the sentencing phase of Higgs's trial, the district court found no reasonable probability that a juror would have found that Haynes was "equally culpable" with Higgs and that this mitigating factor, combined with the others, outweighed the aggravating factors so as to result in the imposition of a sentence of life imprisonment instead of death. We review the district court's denial of a motion for a new trial for an abuse of discretion. *See United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001), *cert. denied*, 535 U.S. 990 (2002).

II.

In *Brady v. Maryland*, the Supreme Court held that the prosecution's failure to disclose favorable evidence to an accused "violates due process where the evidence is material either to guilt or to punish-

ment, irrespective of the good faith or bad faith of the prosecution."
373 U.S. at 87. In order to establish that the government's failure to
turn over evidence constitutes a *Brady* violation, the defendant must
demonstrate (1) that the undisclosed evidence was favorable, either
because it was exculpatory or impeaching; (2) that the prosecution
had the materials and failed to disclose them, either willfully or inad-
vertently; and (3) that the evidence was material to the defense. *See
Strickler v. Greene*, 527 U.S. 263, 280-81 (1999); *Moore v. Illinois*,
408 U.S. 786, 794-95 (1972). Evidence is "material" for purposes of
the *Brady* inquiry "only if there is a reasonable probability that, had
the evidence been disclosed to the defense, the result of the proceed-
ing would have been different." *United States v. Bagley*, 473 U.S.
667, 682 (1985). A "'reasonable probability' is a probability sufficient
to undermine confidence in the outcome." *Id.* Thus, although "the
term '*Brady* violation' is sometimes used to refer to any breach of the
broad obligation to disclose exculpatory [or impeachment] evidence
— that is, to any suppression of so-called '*Brady* material' — . . .
strictly speaking, there is never a real '*Brady* violation' unless the
nondisclosure was so serious that there is a reasonable probability that
the suppressed evidence would have produced a different verdict."
*Strickler*, 527 U.S. at 281.

## A.

We begin with Higgs's claim that he is entitled to a new trial as to
his guilt on the kidnapping, murder, and related charges. Like the dis-
trict court, we have little difficulty rejecting this claim.

First, Haynes's statement that "I'll kill whoever the f--- I want to
kill," made in the heat of a confrontation with another inmate, pro-
vides no information as to any specific motive on the part of Haynes
in the murders and no information at all regarding Higgs's involve-
ment in the murders. Haynes's later statement that "one of the girls
may have set him up" and he "had to kill her" also does not serve to
exculpate Higgs from involvement in the crime. The statements to
Anderson do not indicate that Haynes acted alone or that Higgs was
not involved. At most, it might be viewed as evidence that Haynes
and Higgs had a joint motive to kill the women, but even that premise
is not inconsistent with the theory that Higgs was involved in decid-
ing to kill the women and carrying out that decision, perhaps to retali-

ate against Jackson for an earlier action or the threat she made "to get you *all* f--ked up or robbed." J.A. 473 (emphasis added).

Despite Higgs's claims to the contrary, Haynes's statement also had no impeachment value during the testimony of Victor Gloria or Ednisia Darby. With regard to Gloria, Haynes's statement to Anderson cannot be characterized as impeachment evidence because it does not contradict Gloria's account of the events that evening. Indeed, Higgs does not contend that it has direct impeachment value, asserting instead that it would only have allowed him to cast a "different light" upon Gloria's testimony by arguing that the whispered conversation between Haynes and Higgs in the front seat of the van was Haynes telling Higgs that Haynes intended to kill the women instead of Higgs directing Haynes to kill them. With regard to Darby, the statement also carried no impeachment value. Darby testified that Higgs admitted to her that he was involved in the murders and that Jackson was "snitching" on someone. Supp.J.A.I. 293. Again, Higgs's statement to Darby is not contradicted by Haynes's statement to Anderson.

Finally, even if we were to assume that Higgs could have introduced Haynes's statements to Anderson and used them in some favorable way during the guilt phase of his trial, Higgs has not established a due process violation because he cannot establish the materiality component of the *Brady* inquiry.

According to the uncontroverted evidence, Higgs and Jackson got into a heated argument that evening, which Haynes broke up. As he watched the women leave, Higgs believed Jackson was writing down his vehicle information. He retrieved the murder weapon, and told the other two men to come with him. After the men enticed the women to enter Higgs's van (most likely under the pretense of taking them home), Higgs drove the group into the deserted Patuxent National Wildlife Refuge where he gave the murder weapon to Haynes. Although primarily related by Gloria's eyewitness testimony, the events that evening and Higgs's involvement in them are corroborated in a number of ways. Jackson's day planner, which was found at the murder scene, contained Higgs's name and telephone numbers, as well as a notation of his address and vehicle license tag number. The next evening, before the names of the victims were released, Higgs

commented in response to a television account of the murders that he knew "that Tanji girl." J.A. 672. Darby testified that Higgs confessed his involvement in the murders to her, told her that the women were killed because Jackson was "snitching" on one of them, and told her that the other two were "just for his friends." Supp.J.A.I. 293.[3]

In sum, the evidence of Higgs's guilt in the kidnappings and murders was overwhelming, and the evidence is not contradicted by Haynes's statement to Anderson. We are satisfied that there is no reasonable probability that the jury would not have convicted Higgs of the kidnappings and murders had they been aware of the undisclosed statements made by Haynes to Anderson. Therefore, we conclude that the district court properly denied Higgs's motion for a new trial on the issue of his guilt.

### B.

Higgs next asserts that he is entitled to a new sentencing hearing because Haynes's statement to Anderson would have given him an additional basis upon which to argue that Haynes was "equally culpable" with Higgs in the kidnappings and murders, but only received a sentence of life imprisonment. *See* 18 U.S.C.A. § 3592(a)(4) (West 2000) (providing, as a statutory mitigating factor, that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death").

During the sentencing phase of Higgs's trial, the jury found that the government had proven a total of six aggravating factors: (1) that the deaths occurred during the commission of another crime (kidnapping); (2) that Higgs had a previous conviction of a violent felony involving a firearm; (3) that Higgs had a previous conviction for a serious federal drug offense; (4) that the crimes for which he was on trial involved multiple killings in a single criminal episode; (5) victim impact; and (6) obstruction of justice. Some members of the jury also found the existence of three mitigating factors: (1) that Higgs was not

---

[3]We also note that, had Haynes's confessions concerning the murders that night been admitted in addition to his statements to Anderson, the jury would have learned that Haynes's version of the events also corroborated Gloria's version of the events and Higgs's involvement in them.

the sole proximate cause of the victims' deaths (12 jurors); (2) that Higgs was impaired by alcohol and marijuana at the time of the murders (2 jurors); and (3) that a sentence of death would have an adverse impact on Higgs's minor son (4 jurors). Although submitted as an additional mitigating factor for consideration, no juror found the existence of the "equally culpable" mitigator. After weighing the aggravating factors against any mitigating factors individually found to exist, the jury unanimously found that the aggravating factors outweighed the mitigating factors and imposed a sentence of death.

Higgs contends that Haynes's statements to Anderson that "one of the girls may have set him up" and that he "had to kill her" were of exculpatory value for purposes of the mitigation case and that, had the jurors known about them, it is reasonably probable that at least one juror would have voted against imposition of the penalty of death. We disagree. Even if we assume that the statements were favorable to Higgs for purposes of the mitigation case, Higgs has not demonstrated the requisite materiality to establish a *Brady* violation.

In order to establish the materiality of Haynes's statements to Anderson, Higgs was required to demonstrate a reasonable probability that the disclosure of the statements would have produced a different outcome in Higgs's sentencing hearing. In this case, the six aggravating factors found by the jury were largely undisputed as a factual matter and wholly unaffected by Haynes's alleged statements to Anderson. The statements also have no bearing upon any mitigating factor submitted to the jury, with the single exception of the "equally culpable" factor. Thus, to establish materiality, Higgs was required to demonstrate a reasonable probability that the evidence would have persuaded a juror to reach the conclusion that Haynes was "equally culpable" to Higgs in the murders, *and* that this mitigating factor, combined with the others, would have tipped the balance and led the juror to also conclude that the mitigating factors outweighed the aggravating factors so as to foreclose the sentence of death. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976). "Rather, the question is whether the favorable evidence could reasonably be taken to put the

whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 523 U.S. at 290 (internal quotation marks omitted).

As discussed above, the evidence of Higgs's involvement in the pursuit, kidnapping, and murders of the three women is overwhelming, as is the evidence of his predominant role in the events that took place that evening and early morning. Gloria's testimony, corroborated by Darby's testimony, evidence found at the scene, and other physical evidence, confirms that it was Higgs who set up the "dates" with the girls, Higgs who got into the violent argument with Jackson, Higgs who observed Jackson writing down his license plate number, Higgs who retrieved the .38 caliber murder weapon (which he owned) and told the other two men to come along, Higgs who told Haynes to "trick" the women into getting into the van, Higgs who drove the van past the route back to their homes and into the Patuxent National Wildlife Refuge, Higgs who handed the murder weapon to Haynes moments before Haynes shot and killed the women, and Higgs who orchestrated the destruction of the physical evidence at his apartment after the murders.

Haynes's confession, given in the hours immediately after his arrest, corroborates the evidence presented at Higgs's trial, although his "reasons" for actually shooting the women varied when he later talked to his co-inmates. In his confession, Haynes said that the women were killed because he thought Higgs would kill him if he did not do as he was told. He told co-inmate Vaughn that he killed the women because one of them owed him and his cousin "a quarter of a million dollars." And, he told Anderson that he had to kill the girls because one of them "may have set him up." In this light, we can discern no reasonable probability that any juror would have viewed the single statement Haynes made to Anderson as sufficient to overcome the overwhelming evidence of Higgs's predominant role in the crimes and concluded that Haynes was "equally culpable" with Higgs in the kidnappings and murders.

In any event, we think Haynes's statement to Anderson might have been viewed (at most) as evidence that Haynes may have thought (or been told by Higgs) that Jackson intended to retaliate against "all" of the men and, therefore, that he shared a motive to kill the women with Higgs. However, there is nothing in Haynes's statements to Anderson

that contradicts the overwhelming evidence of Higgs's predominant role in the kidnappings and murders or the government's argument that Higgs was more culpable than Haynes.

Because we are satisfied that the evidence set forth at Higgs's trial provides "strong support for the conclusion that [Higgs] would have been convicted of capital murder and sentenced to death, even if" Haynes's statement to Anderson had been introduced into evidence, *Strickler*, 527 U.S. at 294, we affirm the district court's denial of Higgs's motion for a new sentencing hearing.

### III.

For the foregoing reasons, we affirm the district court's denial of Higgs's motion for a new trial and new sentencing hearing.

*AFFIRMED*