The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
December 24, 2025

## 2025COA95

**No. 23CA1793, *People v. Malcolm* — Evidence — Character
Evidence — Other Crimes, Wrongs, Acts**

A division of the court of appeals addresses the admissibility of
prior alleged acts of child abuse and mistreatment under CRE
404(b) to prove that the defendant committed an act of child abuse
for which the mechanism of injury was unknown. The division
holds that the prior acts in this case were not admissible to show
that the defendant caused the child's injuries because the
prosecution failed to establish any similarity, in nature or severity,
between those other acts and what occurred in this case.

The division also concludes that the erroneous admission of
this evidence was not harmless where the evidence played a
significant role in the prosecution's case, the evidence was

especially prejudicial due to the nature of the other acts, and there

was no direct evidence of what happened to the child in this case.

Court of Appeals No. 23CA1793
Montezuma County District Court No. 22CR43
Honorable Todd Jay Plewe, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Garland Kay Malcolm,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE SCHOCK
Harris and Johnson, JJ., concur

Announced December 24, 2025

Philip J. Weiser, Attorney General, Trina K. Kissel, Senior Assistant Attorney
General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Joseph P. Hough, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Garland Kay Malcolm, appeals her conviction for knowing or reckless child abuse resulting in serious bodily injury. Because we conclude that the district court erred by admitting evidence of other alleged acts of child abuse under CRE 404(b) and that this error was not harmless, we reverse the conviction and remand for a new trial.

## I.     Background

¶ 2     On an early winter morning, Malcolm called 911 to report that her six-year-old son (the child) was nonresponsive and struggling to breathe. She explained that she had been "dealing with" the child that morning because "he doesn't want to sleep right now" and had been getting up and sneaking food. She said she told him to "go outside for a minute," and when he stepped outside, he "went limp." She suggested that he may have hit his head on a snowbank or ice.

¶ 3     The child was taken to the hospital, where he was diagnosed with a permanent brain injury, a skull fracture, a neck ligament injury, and widespread retinal hemorrhages. He also had bruising on his right thigh, a loop-shaped bruise on his left thigh (consistent with having been inflicted by a belt or cord), and bruising and abrasions on his penis. The doctors who treated the child

concluded that his most serious injuries were caused by nonaccidental trauma, or child abuse.  But there was no direct evidence of what had happened or how the child had been injured.  As a result of the brain injury, the child cannot talk or move independently and requires assistance with all aspects of his life.

¶ 4     Malcolm maintained that she did not know what happened.  She and her husband had recently installed three security cameras inside the home because the child had been waking up at night and eating.  On the morning in question, the husband left for work at 5 a.m.  About twenty minutes later, the cameras showed Malcolm entering the kitchen and the child getting out of bed.  At 5:40 a.m., Malcolm spoke with her husband by phone and told him that she would check on the child and had called him down from his room.  And at 6 a.m., Malcolm called her husband back and told him the child was nonresponsive.  She called 911 two minutes later.

¶ 5     Before trial, the prosecution filed a notice of its intent to introduce evidence of other acts of child abuse described by two of Malcolm's other children — ten-year-old A.M. and ten-year-old C.M. — in their forensic interviews.  As detailed in the notice, the other children said that Malcolm had (1) punished the child for sneaking

2

food, defecating on himself, and "various other infractions"; (2) spanked the children with an open hand, a belt, and, in one instance, a brush; (3) hit the children in the face, once giving A.M. a bloody nose; (4) strapped the child and his three-year-old sibling into bed to prevent them from getting food overnight; (5) made the other children spit in the child's peanut butter sandwich after he ate peanut butter out of the jar; and (6) made the children sit in or rub themselves on a snowbank if they had toileting accidents.

¶ 6     The prosecution argued that the evidence was relevant for two permissible purposes: (1) to show Malcolm's motive for the alleged abuse — namely, to punish the child for sneaking food during the night; and (2) to show that the child's injuries were not accidental. Defense counsel objected on several grounds, including that the prosecution had failed to adequately explain how the proffered other acts were relevant to the stated purposes. In particular, defense counsel argued that the prosecution had not articulated any similar motive and that the prior alleged acts fell far short of the "extreme violence" and severe injuries alleged to have occurred in this case.

¶ 7     The district court issued a written order allowing the prosecution to introduce the other acts described by A.M. and C.M.

3

in their interviews.  As relevant here, the court ruled that those acts could be used to show Malcolm's motive for abusing the child and the absence of accidental injury.  It concluded that the evidence was logically relevant to those purposes, independent of any character reference, and that although the evidence was prejudicial, the prejudice was not unfair because "[Malcolm's] explanation for the injuries of [the child] does not comport with" the prior bad acts.

¶ 8     The prosecution introduced the forensic interviews of A.M. and C.M. at trial.[1]  In addition, A.M. or C.M. testified that Malcolm

> (1)  forced the child to stand outside in the winter in his t-shirt and pajamas while Malcolm was in the shower;
>
> (2)  spanked all the children on the "bare butt" with her hand and a belt;
>
> (3)  once hit C.M.'s penis with a belt after he accidentally touched his penis to Malcolm's face while she was spanking him;
>
> (4)  made the children take a cold shower when they got in trouble, including for toileting accidents;

---

[1] Contrary to the People's assertion, videos of the forensic interviews were included in the record on appeal as exhibits.

(5) spit in the child's peanut butter sandwich, along with the other children, after the child had accidentally spit in the peanut butter; and

(6) repeatedly slammed the child and his three-year-old sibling into a snowbank.

¶ 9 The district court gave a limiting instruction at four points during trial — when C.M. testified, when A.M. testified, when the videos of the forensic interviews were played, and in the final jury instructions. The instruction told the jury that it could consider evidence of "other alleged acts of child abuse" only for the limited purposes of "deciding whether [Malcolm] had a motive to commit the acts charged" and "the absence of accident." It also explained that the jury could not consider the evidence "as proof that the defendant has a bad character or any propensity to commit crimes."

¶ 10 The jury found Malcolm guilty of knowing or reckless child abuse resulting in serious bodily injury.

## II. Other Alleged Acts of Child Abuse

¶ 11 Malcolm argues that the district court erred by admitting evidence of her other alleged acts of child abuse and mistreatment of her children in violation of CRE 404(b). She contends that, given

the dissimilarities between the prior acts and the charged act, the prior acts were not logically relevant to motive or lack of accident absent a prohibited inference of her bad character. We agree.

### A. Standard of Review and Applicable Law

¶ 12 We review the district court's admission of other act evidence under CRE 404(b) for an abuse of discretion. *People v. Owens*, 2024 CO 10, ¶ 105. A district court abuses its discretion "when its ruling is manifestly arbitrary, unreasonable, [or] unfair," or when it is "based on an incorrect understanding of the law." *Id.*

¶ 13 Evidence of other crimes, wrongs, or acts is not admissible "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." CRE 404(b)(1). Such evidence may be admissible for another purpose, including proving motive or lack of accident. CRE 404(b)(2); *see People v. Rojas*, 2022 CO 8, ¶ 28 ("[C]ourts can admit uncharged misconduct evidence for almost any non-propensity purpose.").

¶ 14 But to be admissible, other act evidence must satisfy the four-part test set forth in *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990). Such evidence is admissible only if it is (1) logically relevant (2) to a material fact (3) independent of the prohibited inference of

6

the defendant's bad character, and (4) its probative value is not substantially outweighed by the risk of unfair prejudice. *Id.*

¶ 15 The admissibility of such evidence is "contingent upon the articulation of a precise evidential hypothesis by which a material fact can be permissibly inferred," independent of the prohibited character inference. *People v. Williams*, 2020 CO 78, ¶ 12. The prosecution cannot meet this burden simply by reciting a proper purpose and incanting the assurance that it does not seek to prove character. *Id.* Instead, the prosecution must go further and explain precisely *how* the evidence threads that needle. *See id.* at ¶ 13. In other words, the prosecution must explicitly connect the dots from the other act to the stated permissible purpose, with no step in that analysis premised on an inference as to the defendant's character.

### B. Motive

¶ 16 The first purpose for which the district court admitted the other act evidence was to show Malcolm's motive. Although the district court did not specify *how* the evidence related to motive, the People argue that it showed that Malcolm "strictly controlled [the child's] access to food and had harshly disciplined him for sneaking it, which demonstrated a motive for abusing him." The theory

7

seems to be that because Malcolm had previously punished the child for sneaking food, that is probably what she did that morning.

¶ 17    The problem with this theory of relevance is that most of the other acts described by A.M. and C.M. had nothing to do with sneaking food.  For example, many of the acts the children described — the cold showers, the sitting in and rubbing on the snowbank, and some instances of spanking — were tied to toileting accidents.  Others were tied to "getting in trouble" more generally, including for "not listening" and "not doing our schoolwork."  Even the one prior act involving food — the spitting in the sandwich — was not described as a punishment for *sneaking* food but for getting the child's "spit" in the peanut butter jar by eating directly out of it.

¶ 18    Without a tie between the prior acts of abuse and sneaking food, those acts had no logical relevance to the prosecution's theory that Malcolm abused the child for sneaking food.  And to the extent they merely showed a disciplinary motive more generally, that relevance depended on the inference that because Malcolm had harshly disciplined her children in the past, she was an abusive parent who likely got angry and abused her child again.  Such a

propensity inference is "precisely the inference that CRE 404(b) expressly prohibits." *People v. Harris*, 2015 COA 53, ¶ 25.

¶ 19 We have identified only two categories of other act evidence that related to sneaking food — (1) A.M.'s statement in his interview (but not at trial) that Malcolm strapped the child and another child into their beds to prevent them from sneaking food; and (2) the children's statements in their interviews (but not at trial) that *one* reason the child was spanked was for sneaking food. Even these acts present some concerns. The first did not involve *punishing* the child for sneaking food but *preventing* him from doing so. The second was general, with no apparent tie to the severe injuries that Malcolm allegedly caused in this case. And there was ample other evidence that Malcolm was upset by the child sneaking food.[2] *See Williams*, ¶ 14 (noting that the district court must "consider the

---

[2] Nothing in our opinion prevents the prosecution from introducing other evidence that Malcolm sought to control the child's access to food or was upset by the child sneaking food during the night. For example, Malcolm's husband testified that he had recently installed security cameras in the home specifically to prevent the child from eating during the night, and Malcolm told the 911 dispatcher that she and her husband had put all food out of the child's reach the night before because the child "likes to get up and sneak food."

extent to which the proffered other-crime evidence adds logical force . . . to the existing body of evidence proving the same material fact").

¶ 20 Nevertheless, we conclude that the district court could reasonably determine that Malcolm's acts of physically punishing or restraining the child for sneaking food were logically relevant to Malcolm's motive, independent of a prohibited character inference. *Cf. People v. Weeks*, 2015 COA 77, ¶ 30 (holding that prior acts of the defendant becoming "physically abusive when the child or pets urinated in the house" were admissible to show he injured the victim after she urinated in her bed). We therefore conclude that the district court did not abuse its discretion by admitting evidence of these two acts. But because we conclude that the district court reversibly erred by admitting evidence of the other acts, the district court may reconsider at any retrial whether the probative value of these two acts is substantially outweighed by the risk of unfair prejudice in light of this opinion and the other evidence in the case.

### C. Lack of Accident

¶ 21 The second purpose for which the district court admitted the other act evidence was to show a lack of accident. The People argue

that Malcolm's prior acts of abuse made it more likely that the child's injuries were caused by abuse and not by an accidental fall.

¶ 22     We first note that this is not a typical "lack of accident" case. Normally, a lack of accident concerns the defendant's mens rea — that is, whether *the defendant* acted accidentally, as opposed to with the requisite mens rea. *See People v. Casias*, 2012 COA 117, ¶ 51. The issue in this case was not whether Malcolm acted accidentally but whether she acted at all. *See Weeks*, ¶ 29 (addressing the use of other act evidence to prove the actus reus).

¶ 23     Prior similar acts may be relevant to rebut a defendant's claim that a victim was injured accidentally and show that the defendant caused the injury instead. *Id.* at ¶ 26. But to be admissible for this purpose, the other acts must be "roughly similar" to the charged crime and sufficiently numerous to be probative of this issue. *Id.* at ¶¶ 29-30; *see also Casias*, ¶¶ 47-49, 51 (holding that prior acts of child abuse were not admissible to prove absence of mistake given the "dissimilarities between the prior acts . . . and the alleged acts").

¶ 24     The People attempt to confine *Casias* and its emphasis on the degree of similarity to the doctrine of chances theory at issue in that case. *See Casias*, ¶¶ 36-40. But although the People do not frame

their argument as one under the doctrine of chances, their theory is essentially that because Malcolm had abused her children in the past, she likely did so again. *See Weeks*, ¶¶ 25-27 (analyzing such a claim under the doctrine of chances rubric). Whatever label the People might place on this theory, it depends on there being some similarity between the prior acts and the charged one. *See Williams*, ¶ 22 (noting that "commission of the corpus delicti" may be shown by "prior *similar* behavior of the accused" (emphasis added)); *People v. Jones*, 2013 CO 59, ¶¶ 23-27 (holding that prior acts satisfied *Spoto* test in light of similarities to charged sexual assault, without applying doctrine of chances); *cf. Yusem v. People*, 210 P.3d 458, 467 (Colo. 2009) (holding that, although CRE 404(b) does not always require similarity, "the lack of similarity" supported the conclusion that the prior act evidence was not relevant "independent of the inference that [the defendant was] a bully").

¶ 25    Like in *Casias*, the other acts admitted at trial "bear no resemblance" to the act Malcolm was charged with committing in this case. *Casias*, ¶ 47. Of course, we do not know what happened in this case, and the prosecution presented no theory other than that Malcolm caused the injuries. But we know enough to know

12

that several of the prior acts — spitting in the child's sandwich, strapping two of the children into their beds, making the children take a cold shower, and making the children rub themselves on a snowbank — have nothing to do with what happened here. Those acts — none of which involved physical injury — could show only that Malcolm was a bad parent who mistreated her children.

¶ 26 Moreover, we know that whatever happened, it resulted in serious injuries that left the child permanently disabled. None of the other acts of physical abuse described by A.M. and C.M. came anywhere close to that. *See id.* at ¶ 48 (holding that prior acts were not admissible where "the results of the events were different," in that the victim "did not suffer severe injuries as a result"); *Harris*, ¶ 22 (holding that prior act in which "[n]o child was injured" was inadmissible in case involving child abuse resulting in death). The most severe injury that either child described was A.M.'s bloody nose, and both A.M. and C.M. testified that they never noticed any bruises on themselves or their siblings — much less any injuries approaching the severe head injuries the child suffered in this case.

¶ 27 As a practical matter, it may be true that *any* past instance of child abuse makes it more likely that the defendant abused a child

on a different occasion. *Casias*, ¶ 45. But that is precisely the reason for CRE 404(b) — without some tie between the prior acts and the charged one, the logical relevance depends entirely on the impermissible inference that the defendant has a propensity to abuse children. *Id.* Absent that impermissible inference, the fact that Malcolm spanked her children and engaged in other forms of abuse *not* causing injury does not make it more probable that she knowingly or recklessly did something so serious as to cause the child's severe injuries in this case. *Cf. id.* at ¶ 43 (holding that the defendant's prior acts had no tendency to prove that he knowingly caused the victim's death "for the simple reason that [the] defendant's past acts did not result in serious injury or death").

¶ 28     The People point to the testimony that Malcolm made the child stand outside in the winter in his pajamas and "slammed" him into a snowbank, implicitly attempting to draw a parallel between those acts and what happened here. But the prosecution did not attempt to draw any such parallels in the district court. *See Williams*, ¶ 12 (requiring the prosecution to articulate "the precise evidential hypothesis upon which admissibility hinges"). Indeed, the Rule 404(b) notice described the snowbank punishment only as making

14

the children "sit in or be rubbed on a snowbank to clean themselves off if they had toileting accidents." It was not until trial that A.M. described it as physically abusive. And no one suggested that the child's injuries were caused by him simply standing outside in the cold. Thus, on this record, there was no basis for a conclusion that the prior acts were similar to the charged abuse in this case.

¶ 29 The People also assert that the prior instances of spanking could have been relevant to prove that Malcolm caused the child's bruising and penis injuries.[3] But Malcolm was not charged with causing these other injuries, none of which were "serious bodily injury" and none of which (according to the prosecution's expert) contributed to the brain injury for which Malcolm was charged. Nor did the evidence concern acts that Malcolm allegedly committed on the morning of the charged abuse. *See Rojas*, ¶ 52 (defining intrinsic acts as those that directly prove the charged offense or occurred contemporaneously with it and facilitated its commission).

¶ 30 Thus, given the lack of any similarity — in nature or severity — between the other acts and the charged abuse, the other acts

---

[3] Malcolm does not appeal the admission of evidence of the other injuries themselves.

were not logically relevant to prove that Malcolm caused the child's injuries independent of the inference that she was an abusive parent. *See Casias*, ¶¶ 45, 51; *Harris*, ¶ 25; *see also Weeks*, ¶¶ 30, 38 (affirming admission of "strikingly similar" prior acts but noting that admissibility of less similar acts was a "much closer question"). We therefore conclude that the district court abused its discretion by admitting the other act evidence to prove a lack of accident.

### D. Harmlessness

¶ 31 Having concluded that all but two of the other acts were inadmissible to show motive and all were inadmissible to show lack of accident, we next address whether the error was harmless.

¶ 32 A nonconstitutional evidentiary error is harmless when there is no reasonable probability that it contributed to the defendant's conviction. *Casias*, ¶¶ 60-61; *see also Yusem*, 210 P.3d at 469 n.16 ("Erroneous admission of CRE 404(b) evidence is not error of constitutional dimension."). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome of the case." *Casias*, ¶ 63. In making this determination, we may consider the overall strength of the state's case, the impact of the improperly admitted evidence, whether the evidence was

cumulative, and the presence of other evidence corroborating or contradicting the point for which the evidence was offered. *Id.* at ¶ 64. When the error is the improper admission of other act evidence, the most relevant factors are the first two. *Id.* at ¶ 65.

¶ 33     For three reasons, we cannot conclude that the erroneous admission of the other act evidence in this case was harmless. First, that evidence played a significant role at trial. *Cf. id.* at ¶ 68 (holding that erroneous admission of other acts of abuse was harmless where it "did not play a significant role in the case"). Both A.M. and C.M. testified at length at trial, as did the child welfare manager who interviewed them, and videos of their approximately forty-minute forensic interviews were played in full for the jury. A primary focus of the testimony and interviews was Malcolm's other acts of abuse and mistreatment of the child and the other children. *Cf. Williams*, ¶ 24 (holding that erroneous admission of CRE 404(b) evidence was not harmless where "a substantial amount of evidence of prior criminal conduct was presented with little value other than demonstrating that the defendant had sold drugs in the past").

¶ 34     Then, in closing argument, the prosecution highlighted this evidence, referring to the acts A.M. and C.M. described multiple

17

times and calling them "cruel," "extreme," "bizarre," and "sadistic." He continued by encouraging the jury to make the precise propensity inference the evidence invited: "Given the way the defendant regularly punished her children, it's not hard to see how, when that's the type of punishment you routinely engage in, it results in the serious bodily injury [the child] suffered."[4] Thus, even the two acts that were properly admissible to prove Malcolm's motive were lumped in with the others for an improper use.

¶ 35 Second, the erroneously admitted evidence was particularly prejudicial and impactful. *See Casias,* ¶ 67 (noting that the danger of prejudice is "especially great when the evidence involves bad acts against children" and "some acts of child abuse could be so disturbing" as to require reversal if improperly admitted); *Harris,* ¶ 31 ("[T]he impact of the erroneously admitted evidence was greater because it involved putting a defenseless child in danger."). By the prosecution's own characterization, the alleged acts were "cruel" and "sadistic." We cannot discount the possibility that a

---

[4] We reject Malcolm's contention that the prosecutor committed prosecutorial misconduct by referring to this evidence and making this statement, which was consistent with the court's rulings.

jury presented with such behavior "would want to convict [Malcolm] . . . to punish [her] for the uncharged misconduct." *Casias*, ¶ 67 (noting that the acts in that case — slapping a child on her face and shaking and smacking her on the arm — were "not of this type").

¶ 36    Third, there was no direct evidence of what happened to the child. As the People acknowledge, the prosecution's evidence was circumstantial, built in large part on inconsistencies between Malcolm's and her husband's accounts, Malcolm's odd behavior and comments to the 911 dispatcher, and a hearsay statement by C.M. (which he denied making at trial) that he heard Malcolm spanking the child on the morning in question. *See Harris*, ¶ 32 (noting drawbacks of similar child hearsay statement). Although two medical experts testified that the child's brain injury was the result of "nonaccidental trauma," neither could testify as to *how* — or even exactly when — the injury occurred. *Cf. Casias*, ¶¶ 5, 75 (holding that error was harmless where expert witnesses testified that child's injuries had been caused by being violently shaken or slammed against a hard surface). Given this context, there is a reasonable probability that the jury was swayed to convict by Malcolm's history of "cruel" and "sadistic" abuse. *See id.* at ¶ 33.

19

¶ 37    In arguing that the admission of the other act evidence was harmless, the People point to the limiting instructions. But those instructions told the jury that it could consider the evidence as to motive and absence of accident. As we have explained, with two exceptions, any consideration of the evidence for those purposes *depended* on the character inference the instruction told the jury not to make. A defendant is entitled to a limiting instruction when evidence is admissible for one purpose but not another. *See People v. Sabell*, 2018 COA 85, ¶ 38; CRE 105. But such an instruction does nothing to alleviate the prejudice when the evidence is not admissible at all. *See Yusem*, 210 P.3d at 469; *see also Spoto*, 795 P.2d at 1321 (holding that absent a purpose for which the evidence might be relevant, a limiting instruction does "nothing to alleviate the risk" of the jury making the prohibited character inference).

¶ 38    Thus, given the highly prejudicial nature of the other act evidence and its centrality to the prosecution's case, we cannot conclude that the erroneous admission of that evidence was harmless. We therefore reverse Malcolm's conviction.

## III. Malcolm's Other Arguments

¶ 39   Malcolm also argues that the district court abused its discretion by denying her for-cause challenge to a juror and by admitting hearsay testimony from the prosecution's medical expert. Given our reversal of Malcolm's conviction, we do not address these other issues because they are not likely to "arise in precisely the same posture" in a new trial. *People v. Gulyas*, 2022 COA 34, ¶ 29.

## IV. Disposition

¶ 40   The judgment of conviction is reversed. The case is remanded to the district court for a new trial.

JUDGE HARRIS and JUDGE JOHNSON concur.